**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

NAVAJO NATION, a federally recognized Indian
Tribe, on its own behalf, and as *parens patriae* on
behalf of the Navajo people,

       *Plaintiff*,

   vs.

UNITED STATES OF AMERICA,
ENVIRONMENTAL PROTECTION AGENCY;

ENVIRONMENTAL RESTORATION, LLC;

HARRISON WESTERN CORPORATION;

GOLD KING MINES CORPORATION;

SUNNYSIDE GOLD CORPORATION;

KINROSS GOLD CORPORATION;

KINROSS GOLD U.S.A., INC.; and

DOES 1-10,

       *Defendants*.

Civ. Action No. _____

**COMPLAINT**

      Plaintiff Navajo Nation (the "Nation"), a federally recognized Indian tribe, hereby complains against Defendants United States Environmental Protection Agency ("USEPA" or "EPA"), Environmental Restoration, LLC ("Environmental Restoration"), Harrison Western Corporation ("Harrison Western"), Gold King Mines Corporation, Sunnyside Gold Corporation ("Sunnyside Gold"), Kinross Gold Corporation ("Kinross"), Kinross Gold U.S.A., Inc. ("Kinross USA"), and Does 1-10 (together with the others, the "Defendants"), and alleges as follows:

5065281

## SUMMARY OF ACTION

1.       On August 5, 2015, the USEPA and other responsible parties caused an unprecedented environmental disaster when they recklessly burrowed into an abandoned gold mine ("Gold King Mine") and released more than three million gallons of toxic acid mine waste into the waters upstream of the Nation.  For nearly two days, the USEPA did not call, alert or notify the Nation that this toxic sludge had been released and was headed into their waters and land.  At least 880,000 pounds of heavy metals poured out and coursed through downstream waterways, including approximately two hundred miles of the San Juan River (the "River").  One of the Navajo people's most important sources of water for life and livelihood was poisoned with some of the worst contaminants known to man, including lead and arsenic.

2.       Now, a year after one of the most significant environmental catastrophes in history, the Nation and the Navajo people have yet to have their waterways cleaned, their losses compensated, their health protected, or their way of life restored.  Despite repeatedly conceding responsibility for the actions that caused millions of dollars of harm to the Nation and the Navajo people, the USEPA has yet to provide any meaningful recovery.  Efforts to be made whole over the past year have been met with resistance, delays, and second-guessing.  Unfortunately, this is consistent with a long history of neglect and disregard for the well-being of the Navajo people.

3.       The Nation brings this case to finally hold accountable the USEPA, their contractors, the mining companies, and others that have poisoned the San Juan River with their neglect, their wantonness, and their advancement of their own interests above those of the people who live and rely on the waterways.  The Defendants ignored warning signs for years, ignored the years-long buildup of contaminants and hazards, failed to follow reasonable and necessary precautions prior to and during their efforts at the Gold King Mine, and failed to prepare for known

5065281

risks of a mine blowout.  So serious were their failures that Congress has claimed that those involved may be criminally negligent.  These responsible parties have turned a sacred river into a looming threat.  The Nation and its people are entitled to relief for these harms.

4.      The Nation files this suit to be made whole for the entirely avoidable Gold King Mine Spill (the "August 5 Release" or the "Release").  The Release dispersed cadmium, lead, arsenic, beryllium, zinc, iron and copper throughout the Nation's richest and most revered agricultural regions.  The Nation was forced to declare a state of emergency.  The Navajo in particular have a deep and inextricable reliance on and connection to the now contaminated San Juan River.  It is a lifeblood to the Nation, and its contamination has been devastating.

5.      The Release occurred as the USEPA and its contractor, Environmental Restoration, were working at the Gold King Mine.  The Gold King Mine is one of several hundred mines in an area known as the Upper Animas Mining District or the Upper Animas Watershed.  Once mined of its precious metals, the Gold King Mine, like many others in the region, was largely abandoned. But, as Defendants know, the resulting contamination and environmental impact continues even after the mining stops.  That is particularly true in the Upper Animas Mining District, where irresponsible changes were made to the flow of water to maximize economic returns without regard for the water supply.

6.      The Upper Animas Mining District consists of an interrelated maze of mining tunnels, fractures, and waterways.  Activities at one mine or tunnel can have a dramatic and dangerous impact on conditions at another mine and cause contaminated water to discharge from areas in the Watershed that were once dry.  In the mid-to-late 1900s, past and present owners of the region's mines, concerned about their bottom line, began plugging up certain tunnels in the mining system, causing shifts in the direction of water flow through the Upper Animas Watershed.

- 3 -

As the Gold King Mine sat untouched for years, these dangerous conditions began to build up and the once-dry Gold King Mine became impounded with water.  To make matters worse, efforts to sanitize the water of its hazardous contaminants were recklessly neglected.  These decisions contributed to the harm caused by the Release.

7.     With knowledge of these conditions and the chance of a blowout occurring, the USEPA and its contractors decided to nonetheless begin excavating near an entrance at the Gold King Mine.  Before taking heavy machinery to a site known to be impounded with highly contaminated water, the USEPA and its contractors failed to act with caution to protect the Nation and others downstream.  They did not test for water pressure.  They did not await advice from experts who were scheduled to assess the site before the activities began.  They did not have emergency procedures in place.  They knowingly ignored procedures designed to reduce the likelihood of a blowout.  In short, they were completely unprepared and unequipped to be doing anything near the Gold King Mine under the known conditions.

8.     Still, they proceeded, operating heavy machinery near the very barrier holding back millions of gallons of highly pressurized and toxic water.  When that barrier sprung a leak and quickly escalated to a massive blowout, the USEPA and its contractors admitted they had no idea what to do.  They were wholly unprepared to mitigate the damage they had recklessly unleashed.

9.     Even after the blowout, the USEPA and its contractors did not notify downstream communities in a timely and responsible fashion.  While the Release occurred on August 5, the USEPA incredibly did not inform the Nation that a toxic plume was advancing towards their sacred River for nearly two days, sending notification via email at approximately 11:00 p.m. on August 6.

10.     The USEPA, its contractors, and other Defendants caused the Release by a series of intentional, reckless, and/or negligent acts in violation of environmental regulations and

standards of care designed to protect others, like the Nation, from the injuries and damages suffered here. The Release damaged the Nation's environment, people, and economy. It disrupted agricultural, recreational, and economic activities on which the Nation and its people rely. It fundamentally altered cultural, ceremonial, and spiritual practices that support the Navajo way of life.

11. The Release continues to harm the Nation, and will do so for years to come, until at least such time as the Nation's natural resources are fully restored. The Nation is reminded of this devastating pollution every time there is a rainfall, as the toxic elements are dredged up from the River's floor where they have come to rest. Spring, which once symbolized the bringing of new life as many Navajo families planted their crops, now represents a looming threat as Spring runoff instead brings toxic metals to Navajo water and lands. Some of the effects of the Gold King Mine spill have already been felt. But the true toll on the Navajo economy, the Navajo people, and the Navajo way of life will be borne for years to come.

12. The Nation, in its own capacity and as *parens patriae* on behalf of the Navajo people, seeks declaratory and injunctive relief, cost recovery, attorney's fees, and damages. The Nation seeks full, fair, and long overdue compensation for the injuries that occurred and continue to occur within the Nation's territory (the "Navajo Reservation" or the "Reservation").

**THE PARTIES**

A.    The Plaintiff

13. The Nation is a federally-recognized Indian tribe with a governing body recognized by the Secretary of the Interior. The lands and resources of the Navajo Reservation cover approximately 27,400 square miles and extend into the states of Arizona, New Mexico, and Utah. The Nation's seat of government is located in Window Rock, Navajo Nation, Arizona. The Nation

depends heavily on resources provided by the San Juan River (the "River") and its surrounding ecosystems.

      B.    <u>The Defendants</u>

14.    The USEPA is an agency of the United States responsible for maintaining and enforcing national standards under environmental laws and regulations, in consultation with state, tribal, and local governments.  The USEPA may be served at its principal office located at 1200 Pennsylvania Avenue, N.W., Washington, D.C. 20460, or at the United States Attorney's Office for the District of New Mexico.

15.    Environmental Restoration is a Missouri limited liability company with its principal office at 1666 Faick Drive in Saint Louis, Missouri.  Its registered agent is "Corporation Service Company," located at 123 East Marcy Street, Suite 101 in Santa Fe, New Mexico.

16.    Harrison Western is a Colorado Corporation with its principal office located at 1208 Quail Street in Lakewood, Colorado.  Its registered agent is Allan G. Provost Estate, located at the same address.

17.    Gold King Mines Corporation, is, and at all relevant times was, a Colorado Corporation with its principal office located at 729 Reese Street in Silverton, Colorado.  Its registered agent is Stephen C. Fearn, located at the same address.

18.    Sunnyside Gold Corporation is a Delaware Corporation with its principal office located at 5075 Syracuse Street in Denver, Colorado.  Its registered agent is "Registered Agent Solutions, Inc.," located at 36 South 18th Avenue in Brighton, Colorado.

19.    Kinross is a Canadian Corporation, with its principal office at 25 York Street, 17th Floor, Toronto, Ontario, Canada.  Kinross may be served at its principal office or through the branch of the Central Authority in Ontario pursuant to the Hague Convention on Service: Ministry of the Attorney General, Ontario Court of Justice, 393 Main Street, Haileybury, Ontario, Canada.

20.     Kinross USA, a wholly-owned subsidiary of Kinross, is a Nevada Corporation with its principal office located at 5075 Syracuse Street in Denver, Colorado.  Its registered agent is "CT Corporation System," located at 123 East Marcy Street, in Santa Fe, New Mexico.

21.     The Nation further believes that additional defendants, whose identities are not yet known but reasonably may be discovered and are included herein as DOES 1-10, have contributed to the decisions and conduct that caused the Gold King Mine spill.  These may include but are not limited to additional contractors, sub-contractors, governmental entities, or individuals who contributed to or worked on the Gold King Mine on or leading up to August 5, 2015, or who were otherwise responsible for the operation and maintenance of the Gold King Mine, Sunnyside Mine, or other nearby mines whose activities could reasonably affect the conditions at Gold King Mine.

## JURISDICTION

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under 42 U.S.C. § 9601 *et seq.*, the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  The Court also has jurisdiction pursuant to 28 U.S.C. § 1362 because this is an action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, and treaties of the United States.  This Court has supplemental jurisdiction over the Nation's state law claims against Defendants other than the United States pursuant to 28 U.S.C. § 1367(a).

## VENUE

23.     Venue is proper in the United States District Court for the District of New Mexico under 28 U.S.C. § 1391(b) and 42 U.S.C. § 9613(b).

5065281

## GENERAL ALLEGATIONS

A.    <u>The Nation's Unique Dependence On And Relationship To The San Juan River</u>

24.    The Navajo Reservation spans approximately 27,400 square miles and extends into the states of Arizona, New Mexico, and Utah.  The San Juan River courses through the Nation.  The San Juan River Basin is the richest agricultural region across the Reservation.

25.    The Nation as a whole is a largely rural and agricultural society.  Roughly three-quarters of Navajo farmers list farming as their primary occupation, and almost half of the Nation's farm operators indicate that they spent no days performing any work off their farm.

26.    According to the U.S. Department of Agriculture's 2012 Census of Agriculture, there are 14,456 farms on the Navajo Reservation, over 99 percent of which are operated by the Navajo people.

27.    The most populous community in the Nation, Shiprock, straddles the banks of the San Juan River.  According to the U.S. Department of Agriculture, there are approximately 1,500 farms in Shiprock alone.

28.    The Nation also has a great number of cattle and sheep ranchers.  There are more than 5,700 cattle ranch operations and more than 9,000 sheep ranch operations on the Nation.  The Bureau of Indian Affairs estimates that there are 1,175 grazing permit holders in the San Juan River area, some of which run both cattle and sheep ranching operations—as is customary among Navajo ranching families.

29.    The Navajo culture and economy are sustained by the San Juan River, to which the Navajo people are intricately tied.  The River is a critical water source providing water to irrigate crops and sustain livestock.  The San Juan River Basin is also a bastion for ancient heirloom Navajo seed strains, which the Navajo people have carefully refined and cultivated over time to thrive in

the arid region.  Those seed families include many unique species of Navajo corn plants and heirloom Navajo fruits and vegetables.

30.     In addition to their important economic function, Navajo crops are essential to Navajo ceremonies, prayer, and gatherings.  The Navajo people grow many types of corn, each with specific ceremonial purposes.  Traditionally, prayer offerings to the holy people and the Navajo universe are done four times a day, first with ground white corn in the early dawn, second with corn pollen, or *táádidíín*, during mid-day, third with yellow ground corn in the evening, and fourth with wild tobacco during the night.  Without corn pollen and corn itself, the Navajo people are cut off from the holy people, the Navajo universe, and the Navajo language.  Navajo corn seeds are protected by strong farming traditions that have persisted in the San Juan River Basin for generations.  The most important corn variations, white and yellow corn, are grown primarily in the San Juan River basin, and *táádidíín*, is also harvested in the region.

31.     The whole Nation looks to the San Juan River basin to produce the corn used for ceremonial and daily prayer purposes.  This corn and corn pollen is often purchased at the Northern Navajo Fair held in Shiprock each fall.  This fair is known as the oldest, most traditional of the Navajo fairs, and is a time when the annual harvest is shared with family and sold for consumption and use in ceremonies.

32.     Navajo farmers in the region also grow an array of heirloom fruits and vegetables. Those fruits and vegetables are shared over family tables, and are a part of the cultural foundation that keeps Navajo families and the Navajo way of life intact.  Families travel for hours across the Nation to the San Juan River Basin to seek these ingredients for ceremonies and celebrations.

33.     Soil from the San Juan River is used in a number of Navajo ceremonies.  For example, cornfield soil is used during the washing and cleansing of the patient during the Blessing-

Way ceremony.  The dirt from the cornfield represents the birthplace of all plant life and acts as a rejuvenating element.  Additionally, sand from the River bottom is used in ceremonial sand paintings.  Minerals collected along the banks of the San Juan River are also used by Navajo chanters to make ceremonial paintings and markings on a patient's body.

34.     The San Juan River is also a significant spiritual icon for the Navajo Nation and its people.  It is sacred to the Navajo people and embodies the Navajo principle of *hozho*, which encompasses beauty, order, and harmony, and expresses the idea of striving to maintain balance in the Navajo universe.  Harm to the River has a particularly profound impact on the Navajo Nation and its people, disrupting the principle of *hozho* and the entire Navajo way of life.

35.     From an economic perspective, the Nation depends on revenues and other income generated by its people—some of which, in turn, depends on use of and access to the San Juan River.  The Nation also generates tax revenues as a result of economic activity, tourism and recreational activities.

B.     Abandoned Mines In The Upper Animas Watershed

36.     The San Juan Mountains of Colorado are home to several hundred abandoned mines.  Many of them are contained in an area known as the Upper Animas Watershed.  It is well-known that water discharged from these mines and the surrounding areas leads to the Animas and San Juan Rivers, crossing through Colorado, New Mexico, Utah, and even reaching Arizona.  When the water discharged from these mine sites is contaminated with heavy metals and other toxins, it can be dangerous to the environment, aquatic life, and those downstream that are dependent on the rivers.

37.     Located in the Upper Animas Watershed, the Gold King Mine was discovered in 1887, but has been inactive since the 1920s.  It has changed ownership since then numerous times, and is currently owned by the San Juan Corporation, a company owned by an individual named

Todd Hennis. Before San Juan Corporation, the Gold King Mine was owned by Gold King Mines Corporation, a Defendant in this matter.

38.    The Sunnyside Mine is also located in the Upper Animas Watershed, and is currently owned by Sunnyside Gold and Kinross USA, Defendants in this matter. The Sunnyside Mine was discovered in 1873 and grew to be one of the most profitable mines in the area. On information and belief, at one point, the Sunnyside Mine grounds even encompassed a self-contained community, complete with offices, boarding houses, a hospital, and a commissary.

39.    The Sunnyside Mine closed for good in 1991. On information and belief, Sunnyside Mine was owned by Standard Metals Corporation in the mid-1900s, but was transferred to Echo Bay Mines, Inc. in 1985 when Standard Metals Corporation went bankrupt. On information and belief, Echo Bay Mines, Inc. conducted business at Sunnyside Mine under the name Sunnyside Gold.

40.    On information and belief, Kinross consolidated with Echo Bay Mines, Inc. (among other businesses) in or around June 2002. As a result of that merger, Kinross acquired Sunnyside Gold and ownership of Sunnyside Mine. Thereafter, on information and belief, Kinross USA, a subsidiary of Kinross, oversaw or directed the conduct of Sunnyside Gold and the Sunnyside Mine.[1]

C.    The American Tunnel And Its Effect On The Groundwater At Nearby Mines

41.    It is or should be well-known by miners, mining companies, and others involved in the mining activities in the area that the topography of the Upper Animas Watershed is laden with

---

[1] The parent company, Kinross, controls Kinross USA. On information and belief, all of the directors and officers of Kinross USA are Kinross employees and received direction from Kinross. On information and belief, Kinross USA acted as an agent or alter ego of Kinross at all times relevant to this action.

5065281

faults, fissures, and fractures that are impacted by mining behavior.  The tunneling process associated with mining directly affects the flow of groundwater through these mountains and is known to cause the surrounding groundwater to become contaminated.  The contaminated state of this groundwater is often referred to as "acid mine drainage."

42.    In the mid-1900s, Standard Metals Corporation (then-owner of Sunnyside Mine) developed an exploratory tunnel known as the American Tunnel.  The American Tunnel was dug in a lower portion of the Gold King Mine and eventually extended to Sunnyside Mine.

43.    As could be expected, the American Tunnel intercepted the pre-existing flow of groundwater.  The American Tunnel caused acid mine drainage from nearby mines (including the Gold King Mine, Mogul Mine, and Red and Bonita Mine) to essentially dry up, as all of the groundwater was expelled out of the American Tunnel instead.

44.    In the late 1980s, Sunnyside Gold took over an old water treatment facility in the town of Gladstone and began treating the acid mine drainage exiting the American Tunnel through this water treatment system so that the discharged water met relevant state and federal standards. On information and belief, water quality in the Animas and San Juan Rivers improved when this treatment facility was in operation.

D.    Sunnyside Gold And Gold King Mines Corporation Shirked Their Water Quality Responsibilities

45.    The American Tunnel was critical to the success of Sunnyside Mine.  But when Sunnyside Mine ceased operations in the 1990s, Sunnyside Gold attempted to shut down operations as quickly and inexpensively as possible—despite the inevitable, foreseeable, and catastrophic consequences to the environment and downstream communities.  Sunnyside Gold plugged the American Tunnel using two bulkheads—massive plugs in the mine openings designed to hold back the reservoir of toxic waste that would inevitably accumulate within the mine behind

5065281

them.  Sunnyside Gold told Colorado that doing this would lead to a pool of impounded water inside the mine that would cease all discharges from the American Tunnel.  Sunnyside Gold claimed that any water emerging after the bulkheads were installed would have the same characteristics as the natural groundwater—it would not be contaminated acid mine drainage.

46.     When Colorado pushed back, doubting Sunnyside Gold's plan would work and insisting that Sunnyside Gold be responsible for any new or increased flows caused by the bulkheads, Sunnyside Gold eventually entered into a consent decree.

47.     The consent decree required Sunnyside Gold to monitor the water level after installing bulkheads.  If after two years the bulkheads proved to eliminate the discharges and other related water quality requirements were met, Colorado would terminate the obligations under Sunnyside Gold's discharge permit. On information and belief, Sunnyside Gold misleadingly informed Colorado that all criteria were met in 2003.  Based on these representations, the consent decree was terminated.

48.     While this was going on, the water Sunnyside Gold claimed would pool up at the American Tunnel was actually shifting course to other nearby mines.  As the mine owners and operators knew it would, after the Sunnyside Mine closed and the American Tunnel was plugged, the groundwater shifted course to natural fractures in the mountain that led to the Mogul Mine, Gold King Mine and Red and Bonita Mine.  The bulkheads at the American Tunnel directly increased the flow of water to the Gold King Mine, which had been dry, causing the mine to fill with untreated, contaminated water.

49.     Kinross, Kinross USA, and Sunnyside Gold were aware or should have been aware that the installation of bulkheads would shift the flow of water, resulting in water discharges and buildup elsewhere in the intricate mining systems in the Upper Animas Watershed.  They were

aware or should have been aware that these circumstances posed a substantial threat of a future blowout, which could release a significant amount of contaminated, untreated water into downstream waterways, including the River, which courses through the Nation.  Nevertheless, on information and belief, Kinross, Kinross USA, and/or Sunnyside Gold  took no responsibility for increased discharges at other mines.  The likely impact on the Nation and its people was thus disregarded and ignored.

50.     Then-owner of the Mogul Mine, Todd Hennis, confronted Sunnyside Gold about the increased flows at Mogul Mine following the installation of the bulkheads at the Sunnyside Mine and American Tunnel, and sued Sunnyside Gold in 2002 as a result.  However, he was forced to drop his lawsuit due to financial pressure and entered into an agreement with Sunnyside Gold and Gold King Mines Corporation, then-owner of the Gold King Mine.  That agreement included, among other things, transferring responsibility for operating Sunnyside Gold's treatment facility and permit to Gold King Mines Corporation; transferring much of the property in Gladstone to Hennis's company, San Juan Corporation (including some settling ponds associated with the treatment facility); and arranging for Sunnyside Gold to plug Mogul Mine.

51.     On information and belief, San Juan Corporation then leased part of its property containing the settling ponds to Gold King Mines Corporation, with the intent to allow Gold King Mines Corporation to carry out its water treatment obligations.

52.     On information and belief, Sunnyside Gold formally transferred ownership of the treatment facility and its discharge permit to Gold King Mines Corporation in January 2003. Colorado required Stephen Fearn (president of Gold King Mines Corporation) to obtain certification to operate the treatment facility by June 2004, but he never did so.  On information

and belief, Sunnyside Gold was supposed to supervise Mr. Fearn's treatment operations until he obtained certification.

53.     On information and belief, Gold King Mines Corporation continuously neglected its obligations to control the discharge of wastewater from its properties and to operate the treatment facility to protect the water entering the Animas and San Juan Rivers.  During this time, Gold King Mines Corporation exceeded its discharge limits at the Gold King Mine.  On information and belief, Gold King Mines Corporation resorted to diverting untreated discharges from the American Tunnel and Gold King Mine directly into Cement Creek.

54.     Within a few years of Gold King Mines Corporation taking over the treatment facility, it went bankrupt.  At that time, San Juan Corporation acquired the Gold King Mine through a foreclosure action.

E.      The Dangerous And Contaminated Conditions At The Gold King Mine In 2015 Were Foreseeable And Preventable

55.     The buildup of toxic contaminants and pollutants in the Gold King Mine was predictable and foreseeable to the mine's owners and operators, and it did not go unnoticed.  In 1994, the Animas River Stakeholder Group ("ARSG") was formed for the purpose of identifying environmental problems associated with the numerous mines in the area and identifying ways to improve water quality at these sites.  The ARSG is a community group composed of local residents, mining companies, and officials from local, state, and federal government agencies.

56.     The ARSG would rank abandoned mines to prioritize the most environmentally problematic mines.  Although the Red and Bonita Mine and Gold King Mine were not top priorities in the late 1990s, they were identified by the ARSG as the top two priorities after bulkheads at Sunnyside Mine and then, later, at Mogul Mine,  increased flows to these two mines—causing the areas that had been dry for decades to fill up with acid mine wastewater.

5065281

57.     The known impact to the environment and downstream communities is further evidenced by the USEPA twice considering the listing of the Upper Animas Watershed as a Superfund site before the August 5 Release.

58.     In the 1990s, the USEPA and the Colorado Department of Public Health and Environment conducted a site assessment of the Upper Animas Watershed.  This assessment was designed to qualify certain locations for the National Priorities List ("NPL"), which would give the USEPA access to funding for handling environmental risk areas across the country through its Superfund program.  The assessment identified severe impacts to the environment resulting from the heavy metals located in the Upper Animas Watershed.

59.     In 2008 the USEPA initiated further assessments into a more limited segment of the Upper Animas Watershed, focusing only on the Upper Cement Creek area.

60.     Both in the 1990s and 2008, the USEPA concluded that the Upper Cement Creek area would qualify for inclusion on the Superfund NPL but ceded to local resistance, rather than what was in the best interests of the Nation and other downstream communities, and did not include the area on the NPL.  On information and belief, the USEPA instead agreed to help fund mine reclamation efforts in the area.

F.     USEPA's Work At The Red and Bonita Mine Put It On Notice Of Risks

61.     In 2011, the USEPA initiated remedial work at the Red and Bonita Mine due to the increased flow of water to that mine.  Before digging open the portal, or entrance, to the mine, the USEPA asked the Bureau of Reclamation ("BOR") to conduct an independent review of its plans to open the mine.  The BOR warned the USEPA that there was a potential for the water pressure in the mine to build up so high that it would explode out the side of the mountain in which the mine was dug—a phenomenon known as a "blowout."  The BOR asked how the USEPA would respond under those circumstances.

62.     Because of the recognized risk of a blowout, the USEPA instead drilled a well upslope from the Red and Bonita Mine opening that allowed it to measure the water level.  There was more water than expected, but it was not full to the top.

63.     This observation led to the USEPA enlarging its treatment ponds and devising a plan to use a steel pipe through the top to pump the water out to the treatment ponds. After the water was pumped out, the USEPA was able to excavate the portal to the Red and Bonita Mine successfully without a blowout.  Essentially, the USEPA avoided a blowout by taking reasonable, necessary and appropriate precautionary steps to assess and address the water level and pressure at the Red and Bonita Mine before opening up the closed mine.

G.     Defendants' Misconduct At The Gold King Mine

64.     As discussed above, the installation of bulkheads at the Sunnyside Mine and other nearby mines increased water flow and pressure buildup at the Gold King Mine.  On information and belief, Kinross, Kinross USA, and Sunnyside Gold were repeatedly told to re-open the bulkheads at the American Tunnel to relieve the flooding at nearby mines and re-stabilize the water flows, but failed to do so.

65.     On information and belief, Hennis raised concerns about this shift of water, the water quality, and related risks to the USEPA, Colorado, Kinross, and Sunnyside Gold.  Hennis also engaged the USEPA in discussions regarding the Gold King Mine discharges, and even voiced concern about the potential for a blowout as early as 2007.  Hennis sought the USEPA's help investigating the potential blockages at the Gold King Mine site.  In or around 2007, the Colorado Division of Reclamation, Mining, and Safety ("DRMS"), San Juan Corporation, and Todd Hennis

- 17 -

acknowledged and assessed the conditions at the Gold King Mine, after collapses at the mine caused the lower portal known as the Level 7 adit[2] to become blocked.

66.    In or around 2008, DRMS started partial reclamation work at the Gold King Mine to address the discharges of acid mine drainage.  In September 2009, DRMS returned to the Gold King Mine again and backfilled the Level 7 adit.  At that time, DRMS observed a collapse inside the adit.  DRMS inserted an observation pipe to view the collapse, but this led to further collapsing that buried the observation and drainage pipes.

67.    In 2014, DRMS asked USEPA to re-open the Gold King Mine Level 7 adit and investigate the acid mine drainage.  In connection with this work, the USEPA sought a work plan from Environmental Restoration and issued a Task Order Statement of Work on June 25, 2014, which stated:

> The work will be conducted by qualified contractors with the assistance and cooperation of the landowner, San Juan Corp.  In addition to compliance with applicable OSHA standards, the work is to be conducted in compliance with appropriate Mine Safety and Health Administration (MSHA) regulations inclusive of establishing a safe underground working environment for personnel and the rehabilitation of underground workings and escapeways. (Note: MSHA regulations are not applicable to inactive mines; however, certain standards are relevant to the propose[d] work.)  All work will be performed under the conditions as described in an approved Work Plan to be submitted to the OSC for approval that will be prepared by the Contractor and submitted to the Agency before mine rehabilitation work begins.

This Task Order Statement of Work also made clear that those conducting the work were to use best management practices and engineering specifications.

---

[2] The term "adit" is used to describe a horizontal or nearly horizontal tunnel or passageway into an underground mine that can be used for draining, ventilation, and extraction, and is also used to explore for mineral veins.

68.     Environmental Restoration's Request for Proposal ("RFP") dated July 29, 2014, noted that the USEPA tasked Environmental Restoration with "procur[ing] and manag[ing] the reopening and ground support construction at the Upper Gold King Mine – 7 level adit."  The RFP described the scope of the proposed work in technical detail.  Environmental Restoration was to select a subcontractor to "mobilize all labor, material, equipment, and supplies necessary to perform as directed by" Environmental Restoration and the USEPA.  Environmental Restoration would then "conduct operations in oversight management of surface and underground work activities."

69.     The RFP also makes clear that all work would be conducted to "meet all requirements of the State of Colorado as to design and constructions laws," and workers should "fully investigate[] and comply with the need/potential need for a Professional Engineer's review and stamp for project plans."  Furthermore, "personnel and equipment shall comply with all safety requirements set forth in applicable State, Federal and local laws and regulations including the requirements in MSHA and OSHA.  The Subcontractor shall ensure that its employees perform the work in a safe manner. . . ."

70.     On or around September 11, 2014, the USEPA began excavating at the Gold King Mine.  But just two hours after the USEPA began its work, seepage appeared, and the USEPA abruptly halted its efforts.  The USEPA incorrectly estimated that there was approximately six feet of impounded water built up behind the collapsed material.  Because the settling pond installed at the time was not large enough to treat what was believed to be six feet of impounded water, the excavation work was temporarily suspended and they planned to return in the summer of 2015.

71.     After the abrupt termination of its efforts, between September 2014 and the summer of 2015, the USEPA began planning and preparing for the work to be conducted in the future.  On

information and belief, the USEPA's conclusions about the layout of the Gold King Mine contradicted other documentation, including but not limited to DRMS records available at the time. The USEPA's and its contractors' disregard for known facts during this period directly affected the work later performed at the Gold King Mine.

72.     In May 2015, Environmental Restoration submitted an "Action/Work Plan," which included sub-contracting with Harrison Western to complete the project.

73.     In or around June and July 2015, Defendants USEPA, Environmental Restoration, and Harrison Western visited the Gold King Mine several times to assess site conditions and drainage flows.

74.     On or about July 23, 2015, the USEPA and one of its other contractors, Weston Solutions, visited the Gold King Mine again to measure discharge flow.  That same day, a plan was discussed regarding the installation of a sump basin to treat water that would be pumped from the mine for work scheduled to begin in August 2015.

75.     On or around July 23, 2015, the USEPA On Scene Coordinator ("OSC") briefly spoke with a civil engineer at the BOR because he was unsure about the Gold King Mine plans and wanted an outside, independent review.  They agreed that on August 14, 2015, the BOR engineer would conduct an all-day, on-site assessment of the Gold King Mine plans.

76.     In July and early August 2015, representatives of the USEPA, Weston Solutions, Environmental Restoration, Harrison Western, and DRMS were on site taking measurements and preparing for the excavation.  On August 4, 2015, they observed concerning conditions similar to what was seen the previous year: namely, water was seeping out at an elevation of about 5-6 feet above the adit floor.  However, the technique used at the Red and Bonita Mine under similar circumstances—simply drilling into the mine from above to determine the water level inside the

mine prior to excavating—was not used.  According to the BOR, following that approach would likely have prevented the massive blowout Defendants caused on August 5.

77.     Instead of using that tried, trusted and responsible approach to directly observe the level of water *inside* the mine, the USEPA, its contractors and sub-contractors, and DRMS judged the elevation of the water built up behind the collapsed material based primarily on observations of seepage *outside* the mine.  They incorrectly assumed that the water level inside the mine was at a similar elevation as adit seepage observed outside the mine.  These inexcusable errors, which were contrary to existing records and facts that were known or reasonably should have been known at the time, directly resulted in the blowout.

H.     Defendants Caused A Massive Blowout On August 5, 2015

78.     On August 5, 2015, the USEPA, Environmental Restoration, and Harrison Western were present at the Gold King Mine to collectively assess the situation at the Gold King Mine adit/portal.  Two DRMS abandoned mine specialists arrived on site and joined the USEPA's On-Site Coordinator (OSC) to assess the conditions at the adit.  Their careless or reckless assessment allowed them to claim that water was below the top of the adit.

79.     In addition to the careless and/or reckless conduct and assessments, the crew working on site also blatantly disregarded explicit instructions.  In or around late July to early August, the USEPA's OSC (the "Original OSC") left for vacation, leaving another USEPA OSC (the "Substitute OSC") in charge in the interim.  On July 29, 2015, the Original OSC emailed instructions for the week of August 3 to the crew working on the Gold King Mine site.  These instructions differed from the actions actually taken on August 5, 2015.

80.     On information and belief, excavation began on August 5, 2015, contrary to the work plan and despite the fact that the site was not prepared to deal with the potential ramifications of the excavation.  While the contractors and subcontractors were excavating above the old adit,

- 21 -

pressurized water began spurting out.  The water spurting out turned red in color and began to rapidly increase in flow.  Personnel on site evacuated the area as the blowout occurred.

81.     On August 5, 2015, the USEPA, Environmental Restoration, DRMS, and all other parties on site were not prepared to deal with a rapid release of water from the mine, even though this very result was anticipated as a possibility.  A video from the Gold King Mine on the day of the spill shows an on-scene worker asking right after the blowout, "What do we do now?" further evidencing the lack of preparedness on the part of those on site.  Indeed, the parties did not take reasonable steps after the flooding began, or to assess the impact on those downstream. They also initially reported the spill to be a one million gallon release, underestimating the volume by at least a factor of three.

82.     On information and belief and as described herein, the work conducted by the USEPA and its contractors in connection with the Gold King Mine amounted to reckless, careless, and otherwise negligent action that was not driven by policy considerations.

83.     As a result of this conduct, millions of gallons of contaminated water that was stored behind collapsed material spilled out into Cement Creek, a tributary of the Animas River. The U.S. Geological Survey estimated the amount of contaminated water released from the Gold King Mine to be more than three million gallons.  Subsequent data has revealed that at least 880,000 pounds of metals were released into the Animas and San Juan Rivers that day.  This release caused the metals concentrations in the Animas and San Juan Rivers to exceed federal and state water quality standards.  It is estimated that roughly eighty to ninety percent of this amount remains embedded in the riverbeds upstream of the Nation and threatens to re-mobilize during natural runoff, storms, or other events.

An aerial view of the Animas River after the spill is shown below[3]:



84.     The contaminated water laden with toxic metals made its way to the Animas River and then to the San Juan River.  The San Juan River flows through approximately two hundred miles of the Navajo Reservation, and provides much of the Nation's northern border.

85.     The significant exposure to and impact caused by the August 5 Release is compounded by the fact that much of the portion of the River that passes through the Nation is slower moving than upstream areas.  This increases the resident time of the contaminants in the Navajo Reservation, increasing the likelihood of more harmful substances settling into the soils permanently.  It is estimated that most of the metals from the August 5 Release settled into river sediments upstream of the Nation, waiting to be re-suspended and carried downstream.

---

[3] This photograph was published online at: http://nativenewsonline.net/currents/senate-committee-on-indian-affairs-to-host-hearing-on-gold-king-mine-disasters-impact-on-indian-country/

5065281

I.     Defendants Violated Their Duties To The Nation In Connection With The Gold
       King Mine

86.    Defendants owed a duty to the Nation to conduct, regulate, maintain, and oversee

the operations, investigations, and conditions at the Gold King Mine and Sunnyside Mine in a

reasonable manner and with reasonable care.  Failure to exercise reasonable care in these

circumstances posed a foreseeable risk of harm to the Nation downstream, whose people,

livestock, and crops depend significantly on the resources and services provided by the San Juan

River.

87.     By plugging the Sunnyside mine with bulkheads, the owners and prior owners of

the Sunnyside Mine recklessly caused the Gold King Mine, among others, to fill with toxic,

contaminated water, without regard to the effect it would have on nearby mines, the environment,

or the downstream communities.

88.    As early as 2009, the DRMS had recognized the possibility of a blowout at the Gold

King Mine that could result in a release of large volumes of contaminated water from inside the

mine.

89.    As early as June 2014, the USEPA, Environmental Restoration, and/or Harrison

Western had also identified the possibility of a blowout at the Gold King Mine that could result in

a release of large volumes of contaminated water from inside the mine.

90.    This concern was confirmed by conditions observed at the Gold King Mine in

September 2014, resulting in the parties suspending work on the site until 2015.

91.     Nevertheless, on information and belief, the USEPA, Environmental Restoration,

and Harrison Western neglected to perform the necessary engineering analysis to properly assess

the level of water and the pressure built up inside the mine before reconvening the excavation work

in 2015.  The USEPA, Environmental Restoration, and Harrison Western, then operated heavy

5065281

machinery at the Gold King Mine on August 5, 2015, near the collapsed material blocking the pressurized water buildup, with knowledge of the risk of a blowout.

92.     On information and belief, the USEPA,  Environmental Restoration, and Harrison Western, had inadequate emergency response procedures or plans in place in the event that the identified possibility of a blowout materialized.  Indeed, the USEPA's own internal investigation confirmed that the team lacked emergency protocols to handle a significant flow or blowout.

93.     As a result of the lack of preparedness, the USEPA, Environmental Restoration, and Harrison Western, did not adequately respond to the situation immediately after the blowout occurred, including but not limited to taking reasonable efforts to mitigate or abate the flow of toxic, contaminated water into Cement Creek.

94.     The actions and omissions of Defendants in connection with the August 5 Release violated applicable safety and other industry standards for conducting activities under these conditions.

95.      The USEPA and other parties failed to promptly inform downstream jurisdictions about the massive release of toxic, contaminated water headed toward their communities via the Animas and San Juan Rivers.  Although the spill occurred on the morning of A*ugust 5*, the USEPA did not notify the Nation until around 11:00 p.m. on *August 6*, effectively two days after the spill occurred.

96.     The August 5 Release was a result of, at least: (a) Defendants' inadequate design for the closure of the Gold King Mine portal; (b) Defendants' negligent or reckless misinterpretation of the conditions present at the Gold King Mine; (c) Defendants' actions and inactions in carrying out activities at the Gold King Mine; and (d) Defendants' actions and inactions in carrying out activities in surrounding areas and mines.

5065281

J.      The August 5 Release Has Devastated The Nation

97.      As would be expected, the millions of gallons of toxic substances and contaminated water released from the Gold King Mine made its way to the San Juan River.  The River is a critical source of water and a significant cultural and spiritual source for the Nation and its people.  The impact of the August 5 Release has been devastating to the people, wildlife, livestock, economy, culture, and environment of the Nation.  The impacts caused by the August 5 Release include but are not limited to:

a)  *Impacts On Natural Resources*

    i.   The contaminated water from the August 5 Release directly damaged the natural resources on which the Nation heavily relies, including damage to the River and its surrounding resources.

    ii.  The August 5 Release continues to damage those natural resources as contaminants from the spill continue to work their way downstream to the Nation.

b)  *Impacts On Water Supply*

    i.   With the River's water source compromised, the Nation was forced to acquire water from separate sources to sustain its animals and crops.

    ii.  In addition to compromising the Nation's source of water, the USEPA further compromised the health of the Navajo people's animals and crops by providing water in tanks that appeared to be lined with oil residue. This resulted in further distrust of the USEPA, further confusion about the purity of water supplies, and further costs to the Nation as the alternative water supply provided by the USEPA was considered unsuitable.

    iii. The compromised water supply has resulted in significant costs and

- 26 -

5065281

damages to the crops of Navajo farmers, which are important not only to sustain the Navajo people and their livestock, but also as significant cultural and spiritual sources.

c) *Impacts On Economy*

i. The Nation has lost tax revenue as a result of the August 5 Release and has expended significant labor hours in responding to the spill.

ii. The August 5 Release gained immediate national attention, particularly because of the shocking visual of the rivers colored mustard-yellow from the contaminants.

iii. As a result of the national coverage, the Nation's tourism took a hit. Some tourists cancelled their trips to the Reservation entirely, and restricted access to the rivers prevented recreational activities.

iv. The contamination of the River has caused a lasting stigma to the affected land that continues to affect tourism and crop sales in the area.

v. Local businesses were also affected by the August 5 Release, as the spill kept consumers away from the area, causing the Nation further losses in tax revenue. Many agricultural operations run by Navajo farmers and ranchers in the region have struggled since the August 5 Release.

vi. Farming is a major source of revenue to the Nation. Many farmers lost their crops or experienced crop damage due to the compromised water supply. This resulted in an immediate economic impact to the Nation and to the Navajo people, and is an impact that will be felt for many seasons.

d)  *Recreational Impacts*

    i.     The River is a source of recreation.  It is used for fishing, kayaking, rafting, tubing, and swimming.

    ii.    The August 5 Release suspended those activities for a period of time and full use of the River for recreational purposes still has not been restored. There remains a stigma and fear associated with the August 5 Release that limits the use of the River.

e)  *Cultural, Spiritual And Psychological Impacts*

    i.     The River holds a substantial cultural significance within the Navajo Nation.  For example, the River provides water for many unique species of Navajo corn plants that are critical to the Navajo people's prayers and ceremonies, and many heirloom Navajo fruits and vegetables from seed strains refined by the Navajo people over time.

    ii.    The River is one of four sacred rivers that are the boundaries of the Navajo universe.  The four rivers are one whole, as the Earth Mother and the Navajo People are one whole in Navajo thinking.  The San Juan and Colorado Rivers are the male sides, and the Rio Grande and Little Colorado are the female sides.  The San Juan River is an integral part of the Navajo oral history, and was part of the Navajo ceremony when the Navajo ceremonies were learned from the holy people.  Accordingly, it is a key component in all Navajo ceremonies, and is mentioned in all Navajo ceremonies.

    iii.   The River's contamination has profoundly affected the life cycle within the Navajo land, culture and universe and has disrupted the Navajo Way of Life.  As a result, communities and individual Navajo have experienced

- 28 -

> and continue to experience severe spiritual and emotional anguish, separate and distinct from physical damage to the River, even akin to the loss of a loved one.
>
> iv. In the months following the Gold King Mine spill, the Nation experienced a tragic spike in the number of suicides on Navajo territory. This is believed to be related to the trauma and hardship caused to the Navajo people by the Gold King Mine spill.

98. The Nation has spent (and continues to spend) considerable resources in direct response to the August 5 Release. In the days, weeks, and months immediately following the spill, the Nation was forced to quickly assess the impact of the spill on the Nation and protect the Navajo people from the contamination. This included but was not limited to hauling water to those in need, conducting sampling of the River water and sediment, and assessing the impact on farms and ranches dependent on the River. The Nation must continue medical monitoring, mental health assessments and counseling, water and tissue sampling, and other reasonable monitoring necessary to continue to identify and assess the potential long-term effects on the environment and Navajo people.

K. **The USEPA Has Admitted Its Share Of Responsibility For The August 5 Release**

99. In the aftermath of the August 5 Release, the USEPA repeatedly stated that it was responsible for and planned to take responsibility for the Release.

100. Although the USEPA has stopped shy of admitting "fault" on the part of any of its agents, employees, or contractors, the USEPA's own internal investigation found that an underestimation of the water pressure at the Gold King Mine is likely the most significant factor related to the blowout. On information and belief, this underestimation was the result of the Defendants' careless, reckless, and otherwise negligent decisions and conduct.

- 29 -

5065281

L.    The Resulting "Investigations" Of The USEPA And Other Parties Have Been Rife
      With Conflicts And Shortcomings

101.    Shortly after the Release, the USEPA initiated an internal investigation.  On August 24, 2015, the USEPA released a summary of its report.

102.    The USEPA's internal investigation revealed that the work plan lacked sufficient emergency protocols and that the underestimation of water pressure was "believed to be the most significant factor related to the blowout."  The USEPA issued an "addendum" to the internal investigation on December 8, 2015, which contained additional, contradictory information raising more questions than answers.

103.    On October 22, 2015, the United States Department of the Interior ("DOI") Bureau of Reclamation ("BOR") released its "Technical Evaluation of the Gold King Mine Incident." Despite repeated assurances from USEPA Administrator McCarthy that this report would help identify who would be held accountable, the DOI BOR's report did not make any determination of fault or wrongdoing on the part of the USEPA or any other party.  Indeed, it expressly disavowed any responsibility in making findings of wrongdoing.  On information and belief, the DOI was ordered to "stay clear" of addressing the USEPA's negligence in causing the blowout.[4]  Rather, the DOI walked through a cursory review of technical factors at play in the Gold King Mine spill.

104.    Critically, although the DOI BOR report was characterized as an "independent" review, it was prepared by a team of individuals with blatant conflicts of interest in the matter at issue—including at least one individual who played a critical role in the work being conducted at and around the Gold King Mine.

---

[4] "Gold King Mine Investigators Secretly Ordered To 'Stay Clear' Of EPA's Negligence," Ethan Barton, *Daily Caller*, March 8, 2016, available at: http://dailycaller.com/2016/03/08/exclusive-gold-king-mine-investigators-secretly-ordered-to-stay-clear-of-epas-negligence/   (last accessed June 22, 2016)

105.   The resulting investigations by the Federal government have failed to properly and adequately address critical decisions and actions leading to the Gold King Mine spill.  Despite the USEPA repeatedly admitting its responsibility for the spill, the USEPA has not been forthcoming with information regarding the circumstances leading to the spill and the documentation of those efforts.  As the House Committee on Natural Resources noted in a report dated February 11, 2016, the USEPA has resisted requests for documents and information.

106.   Congressional hearings in or around late Fall 2015 noted that some documents were turned over with substantial redactions.  And a video from the Gold King Mine on the day of the spill was edited to cut out commentary of an on-scene worker asking right after the blowout, "What do we do now?"

107.   While the USEPA has admitted responsibility for its role in the conduct that caused the August 5 Release, the conduct of the other Defendants also contributed substantially to the conditions and activities leading up to and present at the Gold King Mine on the day of the Release. It was the joint and collective actions and inactions of all of the Defendants that ultimately damaged the Nation and the Navajo people.

M.   The Office Of Inspector General ("OIG") Initiated A Criminal Investigation Into The Conduct That Caused The Gold King Mine Spill

108.   Since the August 5 Release, the House and the Senate have repeatedly pressured the USEPA to take responsibility for its actions, often noting that private citizens in the same situation would likely face criminal charges for the same behavior.

109.   At several Congressional hearings over the past year, the USEPA has promised that the OIG is conducting a review of the Gold King Mine incident.  Unlike the DOI investigation, this one would allegedly go beyond a technical evaluation of the incident and address fault or wrongdoing.

- 31 -

5065281

110.    On August 1, 2016, nearly one year after the August 5 Release, the OIG announced that it is now conducting a *criminal investigation* of the Gold King Mine spill, in addition to its already planned program evaluation.   Indeed, the program evaluation is being temporarily suspended in favor of prioritizing the criminal investigation.

111.    The Nation shares in the sentiment that the USEPA and its contractors must be held to the same level of accountability as private citizens whose carelessness causes significant environmental damage.   The conduct at issue here caused significant pain and suffering to the Navajo—financially, culturally, spiritually, and emotionally—and Defendants should be required to remedy those wrongs.

N.    The USEPA Denied The Vast Majority Of The Nation's Reasonable Response Costs

112.    In January 2016, the Nation submitted to the USEPA detailed paperwork breaking down all costs expended in response to the Gold King Mine spill.   This included but was not limited to costs for

a.    Assessing the impact of the spill on farms and ranches near the San Juan River;

b.    Conducting necessary water sampling;

c.    Hauling water to Navajo communities in need;

d.    Monitoring and communications in connection with irrigation canal closure; and

e.    Operation of an Emergency Operations Center dedicated to Gold King Mine response.

113.    The total for costs already expended by the Nation to directly respond to the Gold King Mine Spill had by that point amounted to approximately two million dollars.   These costs did

- 32 -

5065281

not reflect the full harm suffered by the Nation as a result of the Release, but only reflected certain categories of costs as enumerated therein.

114.    Since the Release, the Nation has engaged in numerous communications with the USEPA in an attempt to work cooperatively to receive the reimbursement deserved.  To date, the USEPA has only committed to reimbursing a fraction of the Nation's reasonable response costs.

115.    On or around March 10, 2016, the USEPA committed to reimbursing the Nation roughly $157,000, less than eight percent of the amount reasonably requested by the Nation in response to the Gold King Mine spill.  Then, on or around August 5, 2016, a full year after the spill, the USEPA informed the Nation that it had approved and would pay additional reimbursements in the amount of $445,000.  These reimbursements are inadequate and do not reflect anywhere near the full amount of reasonable response costs incurred by the Nation.

* * *

116.    Defendants failed at virtually every step, in most instances advancing their own interests despite the known and substantial risks to others.  Defendants disregarded the potential long-term impacts on downstream communities caused by their conduct in the mines located in the Upper Animas watershed.  Defendants recklessly allowed water to build up in the mines without regard to or concern for the buildup of water pressure caused by their conduct.  Defendants failed to adequately investigate the conditions at the Gold King Mine before beginning to excavate on site.  Defendants disregarded or ignored risks present at the site.  Defendants failed to address the potential consequences of water buildup and pressure present at the Gold King Mine site, despite explicitly acknowledging the risk of water pressure and a blowout.  Defendants failed to have any reasonable system in place to avoid a blowout or manage and mitigate the effects of a blowout in the event that one occurred.  Even after the Release, Defendants failed to adequately inform downstream communities like the Nation, failed to mitigate the effects of the spill, and

5065281

failed to address the devastating consequences of the spill on the Navajo people.  Defendants have consistently acted improperly, shirked responsibility, and failed to fulfill their moral and legal obligations.  Defendants must be held accountable for the harms caused to the San Juan River, to the Nation, and to the Navajo people.

## CLAIMS BROUGHT BY THE NATION

### FIRST CLAIM FOR RELIEF

(COST RECOVERY UNDER CERCLA AGAINST ALL DEFENDANTS)

117.    The Nation incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

118.    All Defendants are "persons" within the meaning of 42 U.S.C. § 9601(22).

119.    The Gold King Mine and the surrounding area constitute a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

120.    The Sunnyside Mine and the surrounding area constitute a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9).

121.    "Releases" of "hazardous substances"—including arsenic, lead, mercury, cadmium, copper, and zinc—from these facilities have occurred and are still occurring.  42 U.S.C. §§ 9601(22) and (14).  These releases include the August 5 Release and subsequent releases.  The hazardous substances from these releases have settled in sediments of the San Juan River in the Nation.

122.    Because of these "releases" and the substantial threat of future releases, the Nation incurred response costs that were both "necessary" and "not inconsistent with the national contingency plan."  42 U.S.C. §§ 9607(a)(4) and (a)(4)(B).

123.    Leading up to and at the time of the August 5 Release, Defendants USEPA, Environmental Restoration, and Harrison Western were acting as operators at the Gold King Mine,

5065281

in that the parties had authority to control and did control, manage, direct, and implement the conduct of those working on site, conduct which contributed to the August 5 Release.

124.     Leading up to and at the time of the August 5 Release, Defendants USEPA, Environmental Restoration, and Harrison Western, by contract or otherwise, arranged for the disposal, treatment, and transport of hazardous substances released from the Gold King Mine.

125.     Leading up to and at the time of the August 5 Release, Defendants USEPA, Environmental Restoration, and Harrison Western accepted hazardous substances from the Gold King Mine and undertook to dispose, treat, and transport hazardous substances away from the Gold King Mine.

126.     Each of the above-mentioned Defendants in paragraphs 123 through 125 performed the activities described herein in a negligent, careless or reckless manner.  For example, each of those Defendants ignored engineering, construction, and safety standards that would be followed by an ordinarily prudent party conducting the same activities under the same circumstances.

127.     Gold King Mines Corporation was a prior owner and operator of the Gold King Mine and is responsible for contributing to the hazardous and other relevant conditions that led to the contaminated discharges from the Gold King Mine.

128.     Kinross, Kinross U.S.A., and Sunnyside Gold are "owners" and "operators" of the Sunnyside Mine, whose conduct contributed to the hazardous conditions that led to the massive release of toxic wastewater from the Gold King Mine on August 5, 2015.

129.     Sunnyside Gold, by contract or otherwise, also arranged for the disposal, treatment, and transport of hazardous substances released from Sunnyside Mine, Mogul Mine, and other nearby mines.  Sunnyside Gold accepted hazardous substances from the mines and undertook to dispose, treat, and transport hazardous substances away from the mines when it undertook

responsibility for treatment facilities and releases caused by the bulkheading of the American Tunnel and Sunnyside Mine.

130.    Defendants are each associated with the August 5 Release, in that each Defendant either temporarily conducted the affairs of the Gold King Mine, owned and/or otherwise operated the Gold King Mine, or otherwise contributed to the circumstances present at the Gold King Mine on August 5, 2015.

131.    Defendants are responsible for the release of more than three million gallons of toxic wastewater and other contaminants from the Gold King Mine and into the nearby waterways eventually leading to the River in the Nation.

132.    The materials disposed of and released from the Gold King Mine constitute hazardous substances within the meaning of CERCLA section 101(14), 42 U.S.C. § 9601(14).

133.    The August 5 Release resulted in impacts to the Navajo Reservation that caused the Nation to incur necessary costs of response, including but not limited to costs associated with providing clean water supplies to the Navajo people; testing and assessing the quality of the soil and water affected by the August 5 Release; implementing medical testing and screening to assess the effect of the August 5 Release on the health of the Navajo people; responding and reacting to the crisis; and attorneys' fees.

134.    Defendants are jointly and severally liable for the Nation's response costs resulting from the August 5 Release.

135.    The Nation in no way caused, contributed to, or consented to the release or threatened release of the hazardous substances from the Gold King Mine and is not affiliated with any other party that is potentially liable for the response costs.

136. To the extent possible, the Nation has taken reasonable steps to stop any continuing release, prevent any threatened future release, and prevent or limit human, environmental, or natural resource exposure to any hazardous substance released from the Gold King Mine.

137. The Nation has cooperated with other governmental and private entities that have contributed to the response actions or natural restoration at the Navajo Reservation in an effort to minimize duplicative efforts and excess costs. The Nation's response costs sought herein include only those that were necessary to incur in responding to the August 5 Release and those that the USEPA has refused to pay to date, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**

(DECLARATORY JUDGMENT UNDER CERCLA 42 U.S.C. § 9613(G)(2) AGAINST ALL DEFENDANTS)

138. The Nation incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

139. CERCLA specifies that in any action for recovery of costs under 42 U.S.C. § 9607 "the court shall enter a declaratory judgment on liability for response costs . . . that will be binding on any subsequent action or actions to recover further response costs . . ." 42 U.S.C. § 9613(g)(2).

140. The Nation will continue to incur response costs to address the ongoing contamination of the San Juan River.

141. The Nation is entitled to entry of a declaratory judgment that Defendants are jointly and severally liable for future response costs and natural resource damages assessment costs based on the contamination of the San Juan River to the extent that those costs are not inconsistent with the national contingency plan.

5065281

## THIRD CLAIM FOR RELIEF

(NEGLIGENCE AGAINST ENVIRONMENTAL RESTORATION, HARRISON WESTERN, SUNNYSIDE GOLD, KINROSS, AND KINROSS USA)[5]

142.   The Nation incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

143.   Defendants were subject to a duty to carry out their activities in connection with the Gold King Mine with the level of care that someone of ordinary prudence would have exercised under the same circumstances.   This includes, but is not limited to, following reasonable engineering, mining, safety, and other applicable standards in the industry.

144.   Defendants breached these duties in the following ways:

a.   Defendants Environmental Restoration and Harrison Western, through their employees and agents, failed to exercise reasonable care in assessing the circumstances at the Gold King Mine leading up to and before undertaking the investigative activities that took place on or around August 5, 2015, including but not limited to failing to conduct or arrange for assessment of the level of pressure present behind the collapsed material at the adit, and failing to account for the recognized risk of a blowout in carrying out the excavation by using methods proven to reduce the likelihood of a blowout;

b.   Defendants Environmental Restoration and Harrison Western, through

---

[5] The Nation intends to file a notice of administrative claim against the United States pursuant to the Federal Tort Claims Act ("FTCA") based on the tortious conduct of the USEPA's officers, employees, and agents.  28 U.S.C. §§ 2671-2680.  If at that time, the Nation's claims are not resolved within the allotted six months after receipt of notice to the USEPA, the Nation will seek to amend its complaint and add the USEPA as a Defendant to the tort claims for relief.  28 U.S.C. §§ 1346(b), 2401(b).

5065281

their employees and agents, failed to exercise reasonable care by neglecting to sufficiently assess the conduct they agreed to undertake at the Gold King Mine, including but not limited to failing to use an employee, consultant, or other agent with the requisite level of engineering experience to conduct such assessment or otherwise recommend to USEPA that the proper assessment be conducted before carelessly entering and acting upon the Gold King Mine on August 5, 2015;

c.      Defendant Environmental Restoration, through its employees and agents, failed to exercise reasonable care by failing to reasonably screen and select a sub-contractor with the requisite experience necessary to safely and properly carry out the activities for which it relied upon a sub-contractor at the Gold King Mine on August 5, 2015;

d.      Defendants Environmental Restoration and Harrison Western, through their employees and agents, failed to exercise reasonable care by carelessly overseeing the operation of machinery and other activities by personnel present at the Gold King Mine on August 5, 2015, and by failing to exercise reasonable care when carrying out activities at the Gold King Mine without first understanding or otherwise reasonably acknowledging the dangerous conditions present at the Gold King Mine on and before August 5, 2015;

e.      Defendants Environmental Restoration and Harrison Western, through their employees and agents, failed to exercise reasonable care by neglecting to follow instructions, regulations, and best management

- 39 -

practices when carrying out activities at and related to the Gold King
Mine;

f.  Defendants Environmental Restoration and Harrison Western, through
their employees and agents, each failed to exercise reasonable care in the
response to the August 5 Release by failing to notify those impacted by
the release in a timely and reasonable fashion;

g.  Defendants Environmental Restoration and Harrison Western, through
their employees and agents, each failed to exercise reasonable care in the
response to the August 5 Release by failing to have an emergency plan
sufficient to guide them in the event of a release like the August 5 Release,
which Defendants had previously explicitly recognized as a possibility;

h.  Defendants Environmental Restoration and Harrison Western, through
their employees and agents, each failed to exercise reasonable care in their
immediate efforts to halt or otherwise mitigate the release of the toxic
wastewater and other contaminants into Cement Creek;

i.  Defendants Kinross, Kinross USA, and Sunnyside Gold, through their
employees and agents, each failed to exercise reasonable care in carrying
out activities at the nearby Sunnyside Mine and American Tunnel by
conducting such activities in a manner that would be reasonably expected
to cause or otherwise contribute to dangerous conditions at the Gold King
Mine, including but not limited to the increased flowed of contaminated
water and the buildup of pressure behind the adit.

- 40 -

145.    Defendants acted together to create these conditions, and are jointly and severally liable for the harm caused by their tortious conduct.  Each of the Defendants' unlawful acts and omissions have directly, foreseeably, and proximately caused, and continue to cause, injury to the Nation and the Navajo people in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**

(GROSS NEGLIGENCE AGAINST ENVIRONMENTAL RESTORATION, HARRISON WESTERN, SUNNYSIDE GOLD, KINROSS, AND KINROSS USA)

146.    The Nation incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

147.    The Defendants breached the duties described herein in a reckless, willful or otherwise indifferent manner constituting more than mere carelessness.

148.    Defendants Kinross, Kinross USA, and Sunnyside Gold recklessly disregarded the known potential impact on downstream communities when they made decisions to bulkhead the American Tunnel and Sunnyside Mine.

149.    Defendants Kinross, Kinross USA, and Sunnyside Gold sought to avoid all responsibility for treating the highly contaminated water created by their own reckless conduct, indifferent to the known potentially devastating impact this conduct could have on downstream communities.

150.    Defendants Environmental Restoration and Harrison Western blatantly disregarded known pressurized conditions at the Gold King Mine site and conducted activities on site in a reckless manner indifferent to the likely impact on downstream communities.

151.    Defendants acted together to create these conditions, and are jointly and severally liable for the harm caused by their tortious conduct.  Each of the Defendants' unlawful acts and

- 41 -

5065281

omissions have directly, foreseeably, and proximately caused, and continue to cause, injury to the Nation and the Navajo people in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (TRESPASS AGAINST ENVIRONMENTAL RESTORATION, HARRISON WESTERN, SUNNYSIDE GOLD, KINROSS, AND KINROSS USA)

152.     The Nation incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

153.     Because the San Juan River passes through the Reservation, the Nation owns or has other legal property rights and interests in and on the land affected by the August 5 Release.

154.     Defendants are and were at all relevant times required to abstain from unlawfully intruding or invading upon the property rights of the Nation.

155.     Defendants Kinross, Kinross USA, and Sunnyside Gold intentionally plugged the American Tunnel and Sunnyside Mine, stopped treatment of acid mine drainage from Sunnyside Mine, and knew or should have known this would impact the direction, quality, and quantity of water flow to nearby mine sites.  Defendants Kinross, Kinross USA, and Sunnyside Gold knew or should have known that this conduct was likely to result in discharges of acid mine drainage highly contaminated with heavy metals.  Defendants Kinross, Kinross USA, and Sunnyside Gold also knew or should have known that this conduct would create pressurized conditions that could lead to a blowout.

156.     Defendants Kinross, Kinross USA, and Sunnyside Gold knew that any discharges of this contaminated water from the Gold King Mine and other nearby areas would be released to Cement Creek, which leads to the Animas and San Juan Rivers, crossing through the Navajo Reservation.

5065281

157.    Defendants Environmental Restoration and Harrison Western contracted with the USEPA to provide technical services at the Gold King Mine site and intended to excavate at the Gold King Mine Level 7 adit.  Defendants Environmental Restoration and Harrison Western knew or should have known that the conditions at the Gold King Mine site presented the possibility of a blowout and their actions could reasonably increase the likelihood of a blowout.

158.    Defendants Environmental Restoration and Harrison Western knew that, in the event of a blowout, highly contaminated water impounded behind the Level 7 adit at the Gold King Mine would make its way from Cement Creek down to the Animas and San Juan Rivers, crossing through the Navajo Reservation.

159.    By causing or otherwise contributing to the August 5 Release, which sent more than three million gallons of toxic wastewater and other contaminants through the San Juan River that passes through the Reservation, Defendants invaded or otherwise caused other Defendants to invade or intrude upon the property rights of the Nation without permission.   Some of the contaminants still remain on the Nation.

160.    This invasion by the Defendants directly, foreseeably, and proximately caused injury to the Nation's property rights in various ways including but not limited to the elimination of sources of tourism revenue and recreation, the destruction of vegetation in areas surrounding the River and property dependent on resources from the River, and as otherwise described herein in an amount to be determined at trial.

161.    Defendants acted together to create these conditions, and are jointly and severally liable for the harm caused by their tortious conduct.  The Nation is entitled to recover damages from Defendants and to entry of an order compelling Defendants to abate the trespass.

## SIXTH CLAIM FOR RELIEF

(PUBLIC NUISANCE AGAINST ENVIRONMENTAL RESTORATION, HARRISON
WESTERN, SUNNYSIDE GOLD, KINROSS, AND KINROSS USA)

162.    The Nation incorporates by reference the allegations in all preceding paragraphs of

this Complaint as though fully set forth herein.

163.    The use and enjoyment of the San Juan River are rights common to, and belonging

to, all members of the public.

164.    Because the San Juan River passes through the Navajo Reservation, the Nation and

the Navajo people own or have other legal property rights and interests in and on the land affected

by the August 5 Release.

165.    Defendants Kinross, Kinross USA, and Sunnyside Gold intended to plug the

American Tunnel and stop treatment of acid mine discharges.  In so doing, they knew or should

have known that this could create dangerous conditions at nearby mines, including but not limited

to the Gold King Mine, such as increased pressure of contaminated water and discharges of

contaminated water at nearby mines.

166.    Defendants Environmental Restoration and Harrison Western intended to perform

excavation activities at the Gold King Mine and knew or should have known about the possibility

of a blowout and that their conduct could cause a blowout.

167.    The toxic wastewater and other contaminants resulting from the August 5 Release

caused by the acts and omissions of Defendants as described herein have unreasonably interfered

with, and continue to unreasonably interfere with, the use and enjoyment of the Reservation.  The

contamination has also presented an unreasonable and significant danger to the health and safety

of those on the Reservation.

5065281

168.     The remaining pollution in the Animas and San Juan Rivers constitutes a continuing and/or permanent nuisance, and the nuisance will continue as long as the Animas and San Juan Rivers and surrounding areas are contaminated with the toxic substances released from the Gold King Mine beginning on August 5, 2015.  As described herein, the contaminants resulting from the August 5 Release have since been deposited into the riverbeds along the Animas and San Juan Rivers, threatening to be re-mobilized by high flow events, such as rainfall and spring snowmelt. Thus, the Nation continues to be threatened by the contamination resulting from the August 5 Release.

169.     The Nation and the Navajo people have suffered and continue to suffer unique injuries as a result of this interference, including but not limited to lost business revenues, tax revenues, and the stigma associated with the contamination.

170.     This unlawful interference by the Defendants directly, foreseeably, and proximately caused and continues to cause injury to the Nation's and the Navajo people's property and other legal interests in an amount to be determined at trial.

171.     Defendants acted together to create these conditions, and are jointly and severally liable for the harm caused by their tortious conduct.

172.     The Nation is entitled to recover damages from Defendants and to entry of an order compelling Defendants to abate the nuisance.

## SEVENTH CLAIM FOR RELIEF

### (PRIVATE NUISANCE AGAINST ENVIRONMENTAL RESTORATION, HARRISON WESTERN, SUNNYSIDE GOLD, KINROSS, AND KINROSS USA)

173.     The Nation incorporates by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth herein.

- 45 -

5065281

174.    Because the San Juan River passes through the Navajo Reservation, the Nation owns or has other legal property rights and interests in and on the land affected by the August 5 Release.

175.    The Defendants' acts and omissions leading up to and in connection with the August 5 Release substantially and unreasonably interfered with the Nation's use and enjoyment of the Reservation and the Nation's properties within the Navajo Reservation in that the impact of the August 5 Release continues to interfere with the Nation's use of the land in considerable ways, including affecting the water supply, irrigation needs, recreational uses, and other interferences as described herein.

176.    This unlawful interference by the Defendants directly, foreseeably, and proximately caused and continues to cause injury to the Nation's property and other legal interests in an amount to be determined at trial.

177.    Defendants acted together to create these conditions, and are jointly and severally liable for the harm caused by their tortious conduct.

178.    The Nation is entitled to recover damages from Defendants and to entry of an order compelling Defendants to abate the nuisance.

## PRAYER FOR RELIEF

WHEREFORE, the Nation requests that this Court enter an order and judgment:

(1)    Against all Defendants, who are jointly and severally liable under CERCLA 42 U.S.C. § 9607(a), for all costs incurred by the Nation in responding to the August 5 Release caused by Defendants, in an amount to be determined at trial;

(2)    Declaring that all Defendants are jointly and severally liable under CERCLA, 42 U.S.C. § 9613(g)(2), for all response costs that will be incurred by the Nation in responding to releases or threatened releases of hazardous substances from the Gold King Mine, the Sunnyside Mine, or the American Tunnel;

- 46 -

(3)     Against Defendants Environmental Restoration, Harrison Western, Sunnyside Gold, Kinross, and Kinross USA, for compensatory, consequential, and punitive damages for injuries directly and proximately caused by Defendants' conduct, as described herein, in an amount to be determined at trial;

(4)     Ordering Defendants Environmental Restoration, Harrison Western, Sunnyside Gold, Kinross, and Kinross USA to abate the nuisance and cure the trespass within the Nation;

(5)     Declaring that Defendants Environmental Restoration, Harrison Western, Sunnyside Gold, Kinross, and Kinross USA are jointly and severally liable for all costs incurred and costs that may be incurred by the Nation to abate the nuisance and cure the trespass within the Nation;

(6)     Against all Defendants, for pre-judgment and post-judgment interest, to the extent not prohibited by law, as well as attorneys' fees, costs, and expenses, and such other and further relief as the Court may deem just and equitable.

5065281

Dated:   August 16, 2016                    Respectfully submitted,

                                            **NAVAJO NATION**

                                            */s/ Paul Spruhan*__ _____ __
                                            Paul Spruhan
                                            Assistant Attorney General
                                            Navajo Nation Department of Justice
                                            Office of the Attorney General
                                            P.O. Box 2010
                                            Window Rock, AZ 86515
                                            Email: pspruhan@nndoj.org
                                            Telephone: (928) 871-6210
                                            Facsimile: (928) 871-6177

**HUESTON HENNIGAN LLP**
John C. Hueston (*pro hac vice pending*)
jhueston@hueston.com
Moez M. Kaba (*pro hac vice pending*)
mkaba@hueston.com
Andrew K. Walsh (*pro hac vice pending*)
awalsh@hueston.com
Kasey L. Mitchell (*pro hac vice pending*)
kmitchell@hueston.com
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4340
Facsimile: (888) 775-0898

***Counsel for Plaintiff Navajo Nation***

5065281