```
               IN THE UNITED STATES DISTRICT COURT

                  FOR THE DISTRICT OF NEW MEXICO


IN RE: GOLD KING MINE           )  No. 1:18-md-02824-WJ
RELEASE IN SAN JUAN COUNTY,     )
COLORADO, ON AUGUST 5, 2015.    )
                                )
This document relates to        )
all matters.                    )
                                )
_____)
```

(All participants appeared remotely)

VIDEOCONFERENCE VIDEOTAPED ZOOM DEPOSITION OF

ROBIN CANTOR, Ph.D., Vol. II

(Pages 265 to 567)

November 9, 2021

11:02 a.m.

Shady Side, Maryland

PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE, THE DEPOSITION WAS:

TAKEN BY:     MR. ANDREW WALSH, ATTORNEY FOR
              NAVAJO NATION

REPORTED BY:  MARCELLA DAUGHTRY, RPR, RMR



Page 274

```
 1      A   Yes.
 2      Q   And what types of -- were you evaluating
 3  economic losses in that -- in that as part of your
 4  retention there?
 5      A   Well, I was reviewing and evaluating the
 6  analysis that had been proffered by the plaintiffs'
 7  expert, and that was to reflect the economic losses from
 8  the wildfire.
 9      Q   Okay.  And what types of economic losses did
10  you evaluate as part of that retention?
11      A   Well, the economic losses that -- that -- and,
12  again, this is a bit tied to the actual information that
13  was proffered by plaintiffs' expert, but I -- in my
14  analysis, I looked at whether or not the analysis that
15  the plaintiff's expert has proffered properly measured
16  the economic losses that would be the foundation for
17  damages for the Blackfeet.
18      Q   Okay.  And what were those economic losses,
19  those claimed economic losses?
20      A   The claimed economic losses had to do with a
21  loss of recreational services from the -- the particular
22  area, including the -- the forest and wildlife and the
23  terrain and the location.  And then there were, in
24  addition to that, I believe that cultural losses were
25  also alleged, and there was timber.  There were timber
```

Page 275

```
 1  losses also alleged.  Those are the three that I can
 2  recall as I sit here.
 3      Q   And you evaluated whether the cultural losses
 4  amounted to economic losses; is that correct?
 5      A   No.  I -- again, the -- what I recall, and I --
 6  I -- I did not go back and review the report, but we can,
 7  you know, perhaps review the report and take a look at
 8  what I did, but the -- the -- the issue was the
 9  plaintiffs' expert had used a particular methodology, and
10  my central criticism there, as it is in this matter, is
11  that he had proceeded with a restoration cost basis for
12  the measure of the damages.
13          And the primary aspect of my opinion was that
14  you can't begin there.  You first have to show the
15  economic losses, and then you can answer the question
16  whether or not the restoration projects are commensurate
17  with those economic losses and, in particular, less than
18  or equal to the economic losses that you measure.
19      Q   And so your opinion in that case was that
20  plaintiffs had not shown whether the restoration projects
21  they were seeking were commensurate with economic losses.
22  Is that fair?
23      A   My primary opinion was that they hadn't
24  measured economic losses at all and that they had simply
25  proceeded with the habitat equivalency analysis
```

Page 276

```
 1  methodology and used that as a substitute or a proxy for
 2  the measurement of the economic losses.
 3      Q   Got it.
 4          And as part of that engagement, what did you do
 5  to actually evaluate cultural losses, if anything?
 6      A   I did not do a affirmative analysis of those.
 7  I wasn't asked to do an affirmative analysis of those
 8  losses.  I did point out, as I have done here, the
 9  listing of economic methodologies that can be used to
10  evaluate such losses.
11      Q   And have you ever been engaged to evaluate
12  cultural losses?
13      A   I think that I have collaborated a number of
14  times with anthropologists, and so at least on, I would
15  say two, possibly three projects, I did look at cultural
16  losses, and in that collaboration with the
17  anthropologists, because the anthropologists typically
18  would bring the appropriate skill set to a measurement of
19  cultural loss.
20      Q   And that was part of the -- those were part of
21  a litigation?
22      A   They were not part of litigation; they were
23  part of my regular research and -- and publication
24  history.
25      Q   But you don't consider yourself an expert in --
```

Page 277

```
 1  in cultural -- in Native American culture of any kind, do
 2  you?
 3      A   I do not consider myself an expert in Native
 4  American culture, no.
 5      Q   And certainly then not an expert in Navajo
 6  Nation culture, correct?
 7      A   And not an expert in Navajo Nation culture, no.
 8      Q   Okay.  And have you ever evaluated claimed
 9  losses spiritual?  Let me start over.
10          Have you ever, as part of any engagement,
11  evaluated any claimed spiritual harm or spiritual losses?
12          MR. LAI:  Objection.  Form.
13          THE WITNESS:  I -- again, I would refer you to
14  work I have done with anthropologists and sociologists
15  looking at these kinds of losses and how much they matter
16  for the market activity and transactions, but I have not
17  -- to my -- I can't recall ever doing it except in the
18  sense of reviewing and evaluating what someone else has
19  proffered in a particular matter as a measurement of
20  those losses.
21      Q   BY MR. WALSH:  And the work you do with
22  anthropologists, were those -- did any of those relate to
23  Native American tribes?
24      A   I think they probably did.  We'd have to go
25  back and look.  I published a book back in 1992 that was
```

4 (Pages 274 to 277)



Page 314

1  treatment by Nazis of -- of the Jewish people.  Is that
2  what you are referring to?
3      A  No.  Actually, the US government committed many
4  of its own horrendous acts against Jewish people, and, in
5  fact, my last name was originally Njvinski, but when my
6  -- my ancestors came here, they had to change the last
7  name to Cantor because Njvinski was too difficult for
8  spelling.
9          And, also, as you probably know, there are many
10 incidents where the US federal government acted in quite
11 horrendous ways towards Jews that were in peril and
12 needed a safe harbor.
13     Q  And your testimony is that, at least in your
14 experience, you have no family members who still have --
15 harbor any mistrust of the US government derived from
16 that history.  Is that your testimony?
17     A  I can't -- I don't want to speak for all my
18 family members.  I -- I certainly know that I don't have
19 an inherent mistrust of the federal government because of
20 those events from decades ago.
21     Q  Okay.  Do you have any understanding of the
22 cultural or spiritual significance of the San Juan River
23 to the Navajo people?
24     A  I -- my understanding comes from some of the
25 materials that have been presented here in -- in this

Page 315

1  matter.
2      Q  So the extent of your understanding about the
3  cultural and spiritual significance of the San Juan River
4  of the Navajo people comes from what you read in expert
5  reports presented by plaintiffs?
6      A  No, not just from that.  I also reviewed a lot
7  of the materials that were referenced in -- either in the
8  context of Dr. Chief's work or I also reviewed quite a
9  number of the depositions, for example, where some of the
10 deponents were referring to the relationship between the
11 Animas/San Juan Rivers and the Navajo Nation.
12     Q  Okay.  And, again, you're not an expert in any
13 way on the significance of the San Juan River or the
14 Navajo people, correct?
15     A  I -- not -- again, when you say the
16 significance, I am not an expert -- for example, as we
17 discussed earlier, I am not an anthropologist.  I am not
18 a sociologist.  I am an economist, and I have examined
19 information that's related to the use of the water
20 resources and potential economic losses because of not
21 having access to those resources or choosing to not use
22 the resources over time.
23         But reserving that area of that economic loss
24 where I am an expert, I will say I am not an expert in
25 the -- some of the cultural and social preferences and

Page 316

1  values that you -- that you just referred to.
2      Q  And you don't have any prior experience in
3  rendering any opinions related to the cultural or
4  spiritual significance of the San Juan River, correct?
5      A  Well, I have experience with looking at
6  cultural and -- and -- and social valuations that are
7  related to water bodies, you know, water resources, but I
8  have not done any work previously on the San Juan River.
9      Q  You said you've had experience looking at
10 cultural valuations related to water bodies.  Have we
11 already discussed those experiences?
12     A  Yes.
13     Q  Okay.  Considering the rivers -- is it fair to
14 say that considering the rivers -- the San Juan River's
15 significance to the Navajo people is outside the scope of
16 your assignment here?
17     A  Can -- can you repeat that, please.
18     Q  Is it fair to say that considering the San Juan
19 River's significance to the Navajo people was outside the
20 scope of your assignment in this case?
21     A  I -- I -- I don't think that that's true
22 completely.  I -- because I focused on the analysis of
23 Dr. Stack and Mr. Unsworth and the Allen plaintiffs, I
24 did review and evaluate analysis tied to their use of the
25 Animas and San Juan for irrigation in the context of

Page 317

1  their claimed losses.
2      Q  So let me be more specific, then.  Considering
3  the San Juan River's cultural or spiritual significance
4  to the Navajo people is outside the scope of your
5  assignment in this case, correct?
6          MR. LAI:  Objection.  Form.
7          THE WITNESS:  I don't think it was outside my
8  assignment because, again, what I was asked to do was
9  review and evaluate the damages analysis that was
10 proffered by the experts for the Navajo Nation and opine
11 on whether or not they had proffered reliable measures of
12 economic loss.  And to the extent that if they had
13 proffered measures of economic loss tied to cultural
14 conditions and changes that occurred because of the Gold
15 King Mine event, then I would have opined on that, but
16 they did not.
17         So I didn't -- I only opined that they didn't
18 proffer anything, but I didn't need to then have an
19 opinion about some other analysis they didn't do.
20     Q  BY MR. WALSH:  So you just testified about what
21 you would have opined on, and what I asked you was, what
22 you did opine on and what you were assigned to do.  So
23 your -- your testimony is that your assignment included
24 considering the cultural and spiritual significance of
25 the San Juan River of the Navajo people?

14 (Pages 314 to 317)

