IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN RE: GOLD KING MINE RELEASE
IN SAN JUAN COUNTY, COLORADO,                               No. 1:18-md-02824-WJ
ON AUGUST 5, 2015

*This Document Relates to:*   No. 16-cv-931-WJ-LF

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART WESTON SOLUTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT TO DISMISS THE NAVAJO NATIONS TORT DAMAGE CLAIMS UNDER COLORADO LAW

**THIS MATTER** comes before the Court on Weston Solutions, Inc.'s Motion for Summary Judgment to Dismiss the Navajo Nation's Tort Damage Claims under Colorado Law, Doc. 1476, filed March 7, 2022 ("Motion"). Environmental Restoration, LLC ("ER") joined in Weston's Motion. *See* Doc. 1484, filed March 7, 2022.

Weston states that the Navajo Nation "seek[s] as damages ... the cost for a series of restorative programs proposed by their damages experts:"

> The restorative programs fall into four categories: (1) $17,382,416 for Environmental Impact Restorative Programs, which include a long-term monitoring plan for the San Juan River, an agricultural assessment plan, a real-time monitoring effort, a community involvement and education on environmental monitoring program, and a scientific support team; (2) $54,124,557 for a Water Surety Program to construct an 11,122 acre-feet reservoir for irrigation needs; (3) $8,358,011 for Health Impacts Restorative Programs, including a continued health assessment program and community mental health support; and (4) $2,649,561 for a Cultural Preservation program. *Id.* at 6. The total cost of the restorative programs is $80,787,511. *Id.*

Motion at 4.

Weston seeks summary judgment denying the Navajo Nation's cost of restoration programs as tort damages because the "claim for $81 million only to restore confidence— unrelated to any quantifiable economic, personal, or property damage to the Navajo Nation—is not a legally cognizable tort damage." Motion at 3. Weston argues that under Colorado law the "restoration costs are inappropriate because (1) the Navajo Nation seeks to repair confidence—

not property, and (2) the cost of the restoration programs is 'wholly unreasonable' in relation to any harm caused by the Gold King Mine release."  Motion at 11; *see also* Mem. Op. and Order at 18, Doc. 166, filed March 20, 2019 ("Colorado law governs Plaintiffs' tort claims.").

Weston states:

> Under Colorado tort law, "'cost of restoration'" is appropriate "as the measure of damages for tortious injury to land." *Slovek*, 723 P.2d at 1315-16 [Colo. 1986] (emphasis added). *See also* Colo. Jury Instr., Civil 18:4 ("the 'cost of restoration' would be an appropriate measure for the recovery of damages for physical injury to property"). Damages should be limited only to "'the cost of restoration that has been or may reasonably be incurred'" to repair the property. *See Slovek*, 723 P.2d at 1315. Here, however, the purpose of the restoration programs proposed by the Navajo Nation's damages experts is to repair "confidence in the resource" of the San Juan River, not land or property. Ex. 6 at 197:21 – 202:25. *See also* Ex. 4 at 119:20 – 120:8. As [Navajo Nation expert] Mr. Unsworth testified, "the goal here is to restore confidence in the river." Ex. 4 at 246:5 – 8.
>
> The restoration programs do not include any physical repair of land or property. Although the Navajo Nation expresses concern that substances left behind in the San Juan River by the Gold King Mine release—if any—could remobilize "during storms and other natural events," none of the restoration programs proposed by its experts call for remedial activities to address this material. Ex. 13 at 2-3. For example, the restoration programs do not include "removing hot spots in the river in sediment depositional areas" that may have been left behind by the Gold King Mine release. Ex. 4 at 120:20 – 25. No environmental remedy or the cost of such remedy has been identified as part of the restoration programs at all. Ex. 6 at 382:4 – 11. Instead, the Navajo Nation seeks programs to contribute "to the confidence in the resource" of the San Juan River by, for example, the construction of a $54 million reservoir. *Id.* at 201:9 – 17.

Motion at 11-12.  To support their assertion that the restorative damages do not include any physical repair of the River or land, Weston quotes deposition testimony one of the Navajo Nation's expert's responses to questions regarding what harms the restorative actions address. *See* Motion at 5 (Undisputed Material Fact ("UMF") No. 5).  The expert stated that each of the following address harms related to "confidence in the resource:" (i) scientific and communication support; (ii) long-term ecological monitoring plan; (iii) agricultural assessment plan; (iv) real-time monitoring effort; (v) community involvement and education on ecological

monitoring; (vi) water surety/reservoir; (vii) continued health assessment; and (viii) cultural impacts assessment.  *See* UMF No. 5, Response at 5-6.  "The restoration programs proposed by the Navajo Nation's damages experts do not seek the removal of substances that may remain in the San Juan River as a result of the Gold King Mine release."  Motion at 9 (UMF No. 20, citing Navajo Nation's expert's testimony).

The Navajo Nation disputes Weston's UMF No. 5 stating the Nation was harmed by the spill, contaminants from the Spill remain in the river and continue to be reanimated in storm and high-flow events, monitoring addresses the potential for resuspension of material ... evaluates the ongoing effect of the Spill and would allow the Nation respond to high-flow events, the Spill resulted in serious harm to the Nation's culture, spirituality, and well-being, the ecological monitoring and water surety programs are necessary but not sufficient to address ongoing cultural and spiritual harms, a continued health assessment and community mental health support addresses the community's concern about the degradation of the sacred river, and a cultural preservation program must be implemented to ameliorate the cultural and spiritual harms caused by desecration of the Nation's most sacred resource.  Response at 7-11.  The Navajo Nation does not cite to any parts of the record showing that the restorative programs include any physical repair of the River or land.  The Navajo Nation states that the recommended construction of an alternative reservoir to be used during high-flow events "would *effectively* remove reanimated contaminants from the water the Nation uses for agriculture and livestock watering" but does not cite to any part of the record showing that the reservoir would physically repair the River.  *See* Response at 14 (emphasis added) (disputing Weston's UMF [Undisputed Material Fact] No. 20).

The Navajo Nation contends that it can recover under many additional theories because it "is entitled to recover for those damages which naturally and probably result from" Weston's negligence.  Response at 22 (quoting *Cope v. Vermeer Sales & Serv. Of Colorado, Inc.*,

3

650 P.2d 1307, (Colo. App. 1982) ("The principle of making the injured party whole underlies all negligence cases"). The Navajo Nation asserts that the Spill caused environmental, property, cultural, and spiritual harms. *See* Response at 19-21.

> These environmental harms and the ongoing uncertainty as to the contamination of the River have caused additional harms unique to the Nation. The River is a deity to the Nation ... and its desecration by the Spill caused a concerning drop in cultural and spiritual engagement with the River ... This drop in engagement and the degradation of a resource sacred to the Nation has harmed the well-being of the Nation's people.

Response at 20. The Navajo Nation states that it seeks damages for harms arising out of the ongoing contamination of the River "on its own behalf and as *parens patriae* for its people." Response at 21-22. The Navajo Nation also states that it is entitled to the following damages: (i) "the reasonable cost of avoiding future invasions;" and (ii) for interference with or loss of use "including the drop in cultural and spiritual engagement with the River ... resulting from the Spill." Response at 22-24 (citing *Cope v. Vermeer Sales & Serv. Of Colorado, Inc.*, 650 P.2d 1307, 1308 (Colo. App. 1982); Bd. Of Cty. Comm'rs of Weld Cty. v. Slovek, 723 P.2d 1309, 1317 (Colo. 1986); *Hoery v. United States*, 64 P.3d 214, 221 (Colo. 2003); Restatement (Second) of Torts § 930; *Schafer v. Hoffman*, 831 P.2d 897, 900 (Colo. 1992); *Vanderbeek v. Vernon Corp.*, 50 P.3d 866, 871 (Colo. 2002)).

In its Reply, Weston contends that the Navajo Nation is not entitled to those damages under other theories. Weston states the Navajo Nation lacks standing to seek redress for spiritual, cultural and emotional damages behalf of itself and the Navajo people because: (i) "emotional damages are a personal and individual matter, not a common injury, and must be so treated;" (ii) "cultural and spiritual damages by tribes on behalf of their people are speculative and not compensable;" (iii) the Navajo Nation "cannot identify any quasi-sovereign interest that it has in redressing such individual concerns" which is required to establish *parens patriae*

4

standing; and (iv) the Navajo Nation has not shown that "it has standing to seek damages for loss of use, which is an inherently individual interest."  Reply at 8-10 (citing Colorado and federal case law).

The Court grants Weston's Motion to the extent it seeks a judgment that the restorative programs proposed by the Navajo Nation's experts do not include any physical repair of the River or land.  Weston quoted the Navajo Nation's expert's testimony that the restorative programs addressed harms related to "confidence in the resource," not harms to the River or property.  The Navajo Nation has not cited to any parts of the record which show that the restorative programs include any physical restoration of the River or land.

The Court denies Weston's Motion to the extent it seeks a judgment that the restorative programs are not appropriate remedies under other theories pursuant to Colorado law.  Weston's Motion briefly discusses that the restoration programs seek to address harm to individual members of the Navajo and that a claim for loss of confidence harms "is, if compensable at all, a claim for pain and suffering by individual members of the Navajo Nation," and cannot be awarded to the Navajo Nation.  *See* Motion at 12-13.  Weston's Motion addressed whether the restorative programs were appropriate damages for the cost of repairing damages to property.  Weston's Motion did not address whether the restorative programs are appropriate remedies under other theories pursuant to Colorado law.

Weston's arguments and citations to Colorado and federal caselaw in Weston's Reply suggest that the Navajo Nation may not be entitled to the restorative damages.  If the Navajo Nation is not entitled to all or some of those damages, the Court prefers to resolve those issues early on instead of requiring the jury to listen to evidence and argument regarding those issues in a three-week long trial.  *See* Doc. 1891, filed January 24, 2023 (The Navajo Nation estimates that

the Phase 1 trial, which will include only the Navajo Nation's claims against Weston and ER, will require 15 days for jury selection, opening and closing statements, and direct and cross examination).

> The Navajo Nation states:
>
> The Navajo people (or Diné) believe that the world is "a living, breathing entity in an animate universe." (**Ex. 11** [Stack/Unsworth] at 8.) The Navajo people "maintain an ancient relationship with the San Juan River" which is "the most important of the sacred rivers in [the Nation]" and is identified with a deity "who protects the Diné and provides life-giving water." (*Id.*) "[H]arm to the [R]iver is understood as not only harm to a natural resource, but harm to an identifiable and cherished entity, much like a family member." (*Id.*) The River has "served hundreds of agricultural, spiritual, cultural, medicinal, and recreational purposes since time immemorial," and [e]nsuring the wellbeing of the [] River is an indispensable part of maintaining a state of *hózhǫ́*." (*Id.* at 8–9.) "*Hózhǫ́* means a balance of normalcy," and if this balance is disrupted, it may "affect a [Navajo] person's thinking, mind, heart, feelings, and outlook, and then also the [] physical part of a person that may not be in harmony." (**Ex. 12** [Antone-Nez] at 56:4–18.)
>
> The pollution and degradation of the River by the Spill—and the disruption of *hózhǫ́*—resulted in serious harm to the Nation's culture, spirituality, and well-being. A study done after the Spill showed that there are 43 ways in which the Navajo people interact with the River, and that after the Spill, these activities had reduced by an average of 56.2%. (**Ex. 1** at 24.) "[T]he decrease in cultural and ceremonial activities, those are related to the contamination of a river that's a deity to the Navajo people, and so there was a disruption in -- their world views of harmony and balance." (**Ex. 13** [Chief Tr.] at 133:4–20.) The cultural and spiritual harm is ongoing: "[U]ncertainty about the continued impact of the Spill on the San Juan River exacerbates harms that began with an initial, widespread reduction in cultural practices in reaction to the Spill." (**Ex. 1** at 25.) The Spill "may lead to a decrease in Diné cultural teachings, which could have setbacks for generations to come." (*Id.*; **Ex. 25** [Van Horne Study] at 35–36.)

Response at 9-11 (stating "cultural and spiritual harms, including to *hózhǫ́,* also support continued health assessments" and "the Nation must implement a Cultural Preservation Program to ameliorate the cultural and spiritual harms caused by desecration of its most sacred resource").

The categories "cultural harms" and "spiritual harms" are are not clearly defined and it appears each may include more than one specific harm.  Although the Navajo Nation refers to decreases in cultural and ceremonial activities and loss of confidence, it is not clear what are all the harms

6

included within "cultural and spiritual harms" for which the Navajo Nation seeks to recover damages.

The Navajo Nation states that in addition to restoration damages, the Nation "can recover under many additional theories." Response at 22. The Navajo Nation refers to "damages [on its own behalf and as *parens patriae* for its people] for harms arising out of the ongoing contamination of the River," "damages which naturally and probably result from Weston's negligence," "continuing trespass and nuisance," and "loss of the use of the property." Response at 21-23. Although the Navajo Nation cites some case law, it is not clear under which legal theories the Navajo Nation is asserting each of its damages claims.

The Court orders the Navajo Nation to file a notice identifying the damages it will seek at trial, the harms those damages are based upon, and the legal theories under which it seeks those damages. The notice must describe with specificity the harms for which the Navajo Nation is seeking damages and the specific legal theories under which it seeks those damages for each harm. The Navajo Nation will not be permitted to assert claims at trial for harms which are not so described in the notice with the legal theory upon which each claim is based. Weston and ER may then file motions for summary judgment on any of the damages/theories in the Navajo Nation's notice. Because there are multiple damages/theories, Weston and ER may file a joint motion for each damage/theory. The Navajo Nation is of course entitled to respond to any such motions filed by Weston andER.

**IT IS ORDERED** that:

(i) Weston Solutions, Inc.'s Motion for Summary Judgment to Dismiss the Navajo Nation's Tort Damage Claims under Colorado Law, Doc. 1476, filed March 7, 2022, is **GRANTED in part** and DENIED in part as follows:

      (a)      The Court grants Weston's Motion to the extent it seeks a judgment that the restorative programs proposed by the Navajo Nation's experts do not include any physical repair of the River or land.

      (b)      The Court denies Weston's Motion to the extent it seeks a judgment that the restorative programs are not appropriate remedies under other theories pursuant to Colorado law.

(ii)      The Navajo Nation shall, within 30 days of entry of this Order, file a notice identifying the damages it believes it is entitled to and the theories under which it seeks those damages pursuant to the specific requirements set forth in this Memorandum Opinion and Order.  Weston and ER may, within 30 days of service of the Navajo Nation's notice, file motions for summary judgment on any of the damages/theories and the Navajo Nation may respond in accordance with the rules of civil procedure.

_____
**WILLIAM P. JOHNSON**
**CHIEF UNITED STATES DISTRICT JUDGE**