# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

IN RE: GOLD KING MINE RELEASE
IN SAN JUAN COUNTY, COLORADO,                                   No. 1:18-md-02824-WJ
ON AUGUST 5, 2015

*This Document Relates to:*   No. 16-cv-931-WJ-LF

## MEMORANDUM OPINION AND ORDER
## GRANTING WESTON SOLUTIONS, INC.'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT TO DISMISS CLAIMS OF NEGLIGENCE

Weston Solutions, Inc. ("Weston") moves for partial summary judgment dismissing the negligence and gross negligence claims stated against Weston. *See* Motion for Partial Summary Judgment to Dismiss Claims of Negligence, Doc. 1487, filed March 7, 2022 ("Motion").

**Summary Judgment**

> Movants "shoulder the 'initial burden [of] show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Clinger v. N.M. Highlands Univ., Bd. of Regents*, 215 F.3d 1162, 1165 (10th Cir. 2000) (quoting *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995)). Should they meet this burden, it then "falls to [the nonmovant] to 'identify specific facts that show the existence of a genuine issue of material fact.'" *Id.* (quoting *Thomas*, 48 F.3d at 484). To survive summary judgment, the nonmovant "must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Id.* (quoting *Thomas*, 48 F.3d at 484).

> "No genuine issue of material fact exists 'unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)); *see also SEC v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) ("Even though we view the evidence in the nonmovant's favor, ... a factual dispute cannot be said to be 'genuine' if the nonmovant can do no more than 'simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006))).

> "For there to be a 'genuine' dispute of fact, 'there must be more than a mere scintilla of evidence,'" and summary judgment is properly granted "if the evidence is merely colorable or is not significantly probative." *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020) (quoting *Vitkus v.*

> *Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993)). And while we draw all reasonable inferences in favor of the non-moving party, "an inference is unreasonable if it requires 'a degree of *speculation* and conjecture that renders [the factfinder's] findings *a guess or mere possibility*.' " *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (alteration in original) (emphases added) (quoting *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008)).
>
> In this vein, "'statements of mere belief' ... must be disregarded" at the summary judgment stage. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Hasan*, 935 F.3d at 1098 (quoting *Bones*, 366 F.3d at 875). Nor can the nonmovant "defeat summary judgment by relying on 'ignorance of the facts, on speculation, or on suspicion.'" *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)). "Rather, '[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.'" *Hasan*, 935 F.3d at 1098 (alteration in original) (quoting *Bones*, 366 F.3d at 875).

*GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200-01 (10th Cir. 2022) (emphasis in original).

**Negligence**

"To recover on a claim of negligence, a plaintiff must establish the existence of a legal duty on the defendant's part, defendant's breach of that duty, causation, and damages." *Smit v. Anderson*, 72 P.3d 369, 372 (Colo. App. 2002). "In determining whether a defendant owes a duty to a particular plaintiff, the law distinguishes between acting and failure to act, that is, misfeasance, which is active misconduct that injures others, and nonfeasance, which is a failure to take positive steps to protect others from harm." *Smit v. Anderson*, 72 P.3d at 372. "Courts . . . apply different tests to establish whether a defendant owed a duty to the injured party depending on whether the alleged negligence is misfeasance or nonfeasance." *Smit v. Anderson*, 72 P.3d at 372. Weston asserts it owed no legal duty to Plaintiffs. *See* Motion at 18-29.

**Misfeasance**

2

> In misfeasance cases, Colorado courts consider the *Taco Bell* factors: "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the defendant." *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987) (en banc) (quotations and alterations omitted). A court may also consider "any other relevant factors based on the competing individual and social interests implicated by the facts of the case." *Greenberg v. Perkins,* 845 P.2d 530, 536 (Colo.1993) (en banc) (quotations omitted). As such, "the question of whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards." *Taco Bell,* 744 P.2d at 46.

*Mid-Century Ins. Co. v. InsulVail, LLC*, 592 Fed.Appx. 677, 683-84 (10th Cir. 2014). "[A]n actor is guilty of misfeasance when it acts affirmatively to create or increase a risk to another." *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 296 (Colo. App. 2009).

Weston asserts that that misfeasance standard does not apply "because Plaintiffs' fundamental claim against Weston involves negligent omissions rather than negligent acts." Motion at 21. Plaintiffs assert that Weston's duty arises from misfeasance because of the following affirmative acts by Weston: (i) calculating the amount of water in the mine; (ii) planning the 2015 site work; and (iii) excavation activities. *See* Response at 19, 24, Doc. 1538, filed April 4, 2022.

Calculating Amount of Water

Plaintiffs assert that:

> Weston's engineer Mr. Petri was responsible for calculating the amount of water behind the blockage at the Gold King Mine—a determination that informed the misguided approach negligently employed by EPA and its contractors. (DMFs 3, 5, 21.) Weston wants to characterize Mr. Petri's calculation as merely ministerial. (*See, e.g.*, Mot. at 19, 26.) But it strains credulity that EPA hired Weston's engineers and paid them as engineers (DMF 19; AMF G) to come to the Gold King Mine and act as human calculators. To the contrary, OSCs Way and Griswold each testified that they expected Weston to provide engineering support. (DMF 19.) And Weston's claim that OSC Griswold disregarded its estimate and instead assumed the adit[1] was "full" is heavily disputed. OSC Griswold's self-serving claim—obviously made to create the impression that he was exercising more care than he was—is not corroborated by any

---

[1] "An 'adit' is a horizontal passage into a mine." *Allen* Plaintiffs' Second Amended Complaint at 103, ¶ 322, Doc. 445, filed January 21, 2020.

3

evidence contemporaneous with the Blowout, and is indeed contradicted by Weston's own witness and OSC Griswold's actions. (DMF 21.)

Response at 20.

At the request of Environmental Protection Agency's ("EPA") OSC ("On Scene Coordinator") Way, Weston's employee, Mr. Petri, "performed a rough calculation of the total volume of water that may require treatment within the Gold King Mine, using dimension assumptions that Mr. Way provided." Declaration of Elliott B. Petri ¶ 20.a., Doc. 1487, filed March 7, 2022. Plaintiffs cite a portion of EPA OSC Way's deposition in which Mr. Way states he "considered water volume for purposes of pursuing the next phase of work . . . preliminary work on [calculating the volume of water] would have been done working with Weston . . . [because] That was one of their primary charges . . . to work on – the water management system and conveyance associated and so on." Steven Way Deposition at 206-207, Doc. 1295-5 at 7, filed August 6, 2021. Plaintiffs do not, however, cite any portions of the record showing that Weston's calculation would be used for any purpose other than estimating the volume of water in the Gold King Mine that may require treatment.

Planning 2015 Site Work

> Plaintiffs state that:
>
> Weston was closely involved in planning the 2015 site work with OSC Way over the course of many months (DMFs 9, 19), including drafting the POLREP [Pollution Report] after the 2014 work, which stated that one purpose of subsequent work would be to "to reduce the potential for uncontrolled releases of water from the mine" (AMF C). Mr. Petri was tasked with creating a sketch of a sump basin to be installed to handle water from reopening of the adit, which included assumptions and estimates regarding pipe locations and adit dimensions. (DMF 3.) Weston was expected to assist with numerous considerations regarding excavating the blockage and managing impounded water within the adit. OSC Way tasked Weston with performing calculations related to the manmade pond capacity that would be required to capture anticipated wastewater discharge from the Gold King Mine. (DMF 9.)

4

Response at 21. Plaintiffs also state that Matthew Francis, with ERRS, "testified that in drafting the work plan for [the excavation at] the Gold King Mine site, there 'mostly likely' was input from Weston, among other, and 'the work plan was a result of discussions between all parties.'" Response at 10, ¶ 11. However, Mr. Francis also testified that he did not "recall any specific revisions that Weston suggested with regard to the 2015 work plan." Deposition of Matthew Francis at 314:1-20, Doc. 1220-32, filed May 28, 2021. And EPA Contractor Harrison Western's Rule 30(b)(6) designee testified he was "not aware of any involvement" "from Weston during development of Harrison Western's plan for" entry into the Gold King Mine. Deposition of Christopher A. Hassel at 194:6-9, Doc. 1220-37 at 2, filed May 28, 2021.

Excavation Activities

Weston asserts the following facts regarding its role in the excavation at the Gold King Mine:

> 28. [EPA OSC] Mr. Way agreed that Weston lacked the authority to "direct" the excavation work of ERRS [EPA's Emergency and Rapid Response Services contractor] employees, but Weston could "advise" that work. This authority included "guiding excavation activities, depending on the nature of the work." Decisions regarding the excavation would ultimately be made by the OSC. Dkt. 1295-5, 540:20-25, 548:6-18.
>
> 29. When asked to detail "all of those specific topics on which [he] expected Weston to have input" with respect to "[e]xcavation-construction related activities," [OSC] Mr. Way identified "[t]hose that related to the water management system and any construction associated with that." Dkt. 1295-5, 549:13-550:9.
>
> 30. Weston did not perform excavation at the [Gold King Mine] site. Dkt. 1220-32: 318:6-20.
> . . . .
>
> 77. [EPA OSC] Mr. Griswold testified that he personally directed the excavation on August 4-5 and made the ultimate decisions concerning the excavation. Dkt. 1220-30, 555:11-559:1.

Motion at 10-11, 16. Plaintiffs do not dispute these facts.

5

> Plaintiffs assert Weston was involved with the excavation activities at the Gold King Mine:
>
> > each of the OSCs testified that Weston provided input on the excavation. OSC Way testified that "there was an expectation of [Weston] having direct input into what the nature of the excavation . . . or construction-related activities may be," specifically as "related to the water management system and any construction associated with that." (DMF 8.) OSC Griswold testified that Weston engineer Petri was actively involved with "inspecting" excavation on August 4 and 5, 2015—which OSC Griswold defined as "[taking] a close look" and "[i]nspect[ing] for any signs that we were approaching the blockage, any hints, any clues." (DMF 4.) In the moments immediately following the Blowout, a video captured the voice of Mr. Petri stating, "*We* were digging really high" and then asking, "What do *we* do now?" (AMF K (emphasis added).)

Response at 21-22.

Conclusion Regarding Misfeasance Duty

The Court concludes that Weston did not owe a duty to Plaintiffs under the misfeasance standard. Weston's employee performed a rough calculation of the total volume of water that may require treatment within the Gold King Mine at the request of EPA's OSC using dimension assumptions that EPA's OSC provided. Plaintiffs have not cited to portions of the record showing that Weston performed the calculation incorrectly, that it was foreseeable that EPA's OSC would use the results of Weston's calculation for anything other than planning for treatment of the water, or that EPA's OSC even used Weston's calculation in deciding how to proceed with the excavation.

Plaintiffs have not cited to portions of the record that show Weston was involved with the planning of the excavation at the Gold King Mine as opposed to planning other activities at the Gold King Mine or explain how Weston's alleged involvement with the planning of the excavation at the Gold King Mine created or increased the risk to Plaintiffs.

Plaintiffs state that during the excavation a Weston employee was inspecting for any signs that EPA's contractor was approaching the blockage in the Gold King Mine. Plaintiffs have not cited

6

to any portions of the record that show the Weston employee performed the inspections in a negligent manner.

**Nonfeasance**

> Where the alleged tortfeasor's action constitutes mere nonfeasance, the alleged tortfeasor has a duty to take affirmative action for another's aid or benefit only "where there is a 'special relationship' between the actor and the injured party or the actor committed itself to the performance of an undertaking, gratuitously or by contract, under the circumstances described in sections 323, 324, or 324A of the Restatement (Second) of Torts." *Western Innovations,* 187 P.3d at 1159–60 (citing *Univ. of Denver,* 744 P.2d at 58 n. 3, and *Smit,* 72 P.3d at 372).

*Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282, 295 (Colo. App. 2009).  Weston asserts, and Plaintiffs do not dispute, that only Section 324A of the Restatement (Second) of Torts applies.  *See* Motion at 23 n.3; Response at 24.  Section 324A states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A (1965).  Weston states Section 324A:

> comprises several elements: (1) the defendant must "undertake . . . to render services to another"; (2) the defendant must know or should know that the services are "necessary for the protection of a third person."; (3) the defendant must fail to exercise reasonable care; and (4) one of the three conditions in subsections (a)-(c) must apply. Here, the first element is at issue.

Motion at 24.

In an analysis of whether a duty arose under Section 324A from a contractual undertaking, the Tenth Circuit stated:

> Even if the agreement is a classic contract for services—a view for which there is some supporting evidence—the real question is one of contract interpretation. The inquiry is whether workplace safety is one of the "services" the agreement obligated CVR Energy to perform. This is because § 324A supports liability only when a person assumes a duty to render specific services. And it is axiomatic that not every services agreement requires the obligor to assume responsibility over the entirety of the obligee's operations, just as not every independent contractor assumes full responsibility. The scope of the services set out within the four corners of the contract, therefore, will determine the entirety of CVR Energy's obligations and liability. *See Honeycutt v. City of Wichita*, 251 Kan. 451, 836 P.2d 1128, 1137 (1992) ("The extent of the undertaking should define the scope of the duty.").
>
> . . . .
>
> The phrase "day-to-day business and operations" taken in isolation suggests that CVR Energy was obligated to run the whole show, which undoubtedly includes workplace safety at a business such as an oil refinery. . . But these provisions—without context—are vague at a minimum. There is little hint regarding the scope and nature of the management services or the safety advice. . . . These ambiguities highlight the necessity of considering each provision in light of the entire agreement. *See Cellport Sys., Inc. v. Peiker Acustic GMBH & Co. KG*, 762 F.3d 1016, 1029 (10th Cir. 2014) (noting that it is "error to interpret words in [a] contract 'alone and out of context' ") (citation omitted).

*Grice v. CVR Energy, Inc.*, 921 F.3d 966, 971-72 (10th Cir. 2019).

Weston cites to its contract and other documents that show Weston was tasked with activities related to the treatment of water discharged from the Gold King Mine such as developing a sampling and analysis plan, developing water treatment requirements, monitoring the water treatment system and the discharged water, and documenting site activities. *See* Motion at 5-10, ¶¶ 4-25. Weston states those "documents do not, as a matter of law, indicate that Weston assumed any duty to Plaintiffs with respect to the excavation activities on August 4-5, 2015." Motion at 26.

Plaintiffs quote the statement of work in Weston's contract which "states that, among other things, Weston 'shall provide technical support to EPA on removal assessment activities'" and a task order under that contract which states "the Contractor will provide **holistic technical support** to EPA On Scene Coordinators (OSC) during emergency response and removal actions." Response at 14, ¶ A (emphasis in original). Plaintiffs contend:

> Pursuant to its broad duties to provide holistic technical support, Weston rendered services—at EPA's request—that were "reasonably calculated" to avoid the possibility of a blowout, of which Weston was aware. (DMF 9; AMFs C, J.) Most directly, OSC Griswold testified that he directed Weston's Mr. Petri to inspect the excavations on August 4 and 5, 2015, specifically to assess whether they had reached the blockage. (DMF 16.) Given that the blockage was holding back massive amounts of water, and Weston—along with the rest of the team—was aware of the possibility of an uncontrolled release from the mine, Mr. Petri's "service" of inspecting and evaluating excavations was unmistakably "calculated" to avoiding disturbing the blockage and causing a blowout. And, because Mr. Petri negligently performed this service, EPA, ER, and Weston excavated too far into the blockage and caused the precise disaster they sought to avoid.
>
> Moreover, as noted above, another "service" Weston performed pursuant to its broad charge was miscalculating the amount of water within the adit. (DMFs 3, 5, 21.) Again, Weston would like to frame its responsibility here as ministerial, but OSC Way testified that Mr. Petri's calculation was not merely about water treatment, and instead was about the "volume of water impounded" within the adit. (AMF D.) And, while Weston claims that OSC Griswold and the team did not rely on Mr. Petri's gross miscalculation because OSC Griswold assumed the adit was full of water, the evidence here is disputed. Weston's own Mr. Petri testified that he was not aware of OSC Griswold's supposed assumption, nor was ER's Mr. Francis. (DMF 21.) And both Mr. Francis and Mr. Petri testified that they believed the Blowout occurred because OSC Griswold—like everyone else proceeding on the assumptions Weston used to make its miscalculation—misjudged the height of the water in the adit. (*Id.*)

Response at 25-26.

The Court concludes Weston did not assume a duty to Plaintiffs regarding the excavation activities pursuant to the nonfeasance standard. Plaintiffs show that the EPA OSC directed a Weston employee to inspect the excavation for signs that the EPA and the contractor performing the excavation were approaching the blockage in the Gold King Mine and that Weston performed a calculation to estimate the volume of water in the Gold King that may require treatment within the Gold King Mine, using dimension assumptions that the EPA OSC provided. Plaintiffs have not cited any provisions in Weston's contract that obligated Weston to provide services related to the excavation. Plaintiffs reference to the vague provision that Weston provide "holistic technical support" to EPA On Scene Coordinators during response and removal actions, by itself, is not sufficient to show that Weston assumed a duty to Plaintiffs for the excavation activities. *See Grice*

9

*v. CVR Energy, Inc.*, 921 F.3d 966, 972 (10th Cir. 2019) ("The scope of the services set out within the four corners of the contract, therefore, will determine the entirety of CVR Energy's obligations and liability").  Relying on the "holistic technical support" provision out of context of the other provisions in the contract would require Weston to assume liability over the entire Gold King Mine project.

**IT IS ORDERED** that Weston Solutions, Inc.'s Motion for Partial Summary Judgment to Dismiss Claims of Negligence, Doc. 1487, is **GRANTED.**

_____
**WILLIAM P. JOHNSON**
**CHIEF UNITED STATES DISTRICT JUDGE**